**EARTH ISLAND INSTITUTE, a California Nonprofit Corporation; Todd Steiner; The American Society for the Prevention of Cruelty to Animals, a New York Nonprofit Corporation; and The Humane Society of the United States, a Delaware Nonprofit Corporation, The Sierra Club, a California Nonprofit Corporation; and The Georgia Fishermen's Association, Inc., a Georgia Corporation, Plaintiffs,**

v.

**Warren CHRISTOPHER, Secretary of State; Robert E. Rubin, Secretary of Treasury; Elinor G. Constable, Assistant Secretary of State for the Bureau of Oceans, International Environmental, and Scientific Affairs; Ronald Brown, Secretary of Commerce; and Rolland A. Schmitten, Assistant Administrator for Fisheries, National Marine Fisheries Service, Defendants,**

and

**National Fisheries Institute, Inc., Intervenor–Defendant.**

**Slip Op. 95–208.
Court No. 94–06–00321.**

United States Court of International Trade.

Dec. 29, 1995.

Heller, Ehrman, White & McAuliffe (Joshua R. Floum, Nicole J. Walthall and James L. Williams), San Francisco, CA, and Eugene Underwood, Jr. and Jamie H. Cotel, New York City, for plaintiffs.

Frank W. Hunger, Assistant Attorney General; Lois J. Schiffer, Actıng Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division (Jeffrey M. Telep) and Environment & Natural Resources Division (James C. Kilbourne and Christiana P. Perry), U.S. Department of Justice; and Office of Legal Adviser, U.S. Department of State (David Balton), Office of General Counsel, National Oceanic and Atmospheric Administration (Jason Patlis) and Office of Chief Counsel, U.S. Customs Service (Lou Brenner, Jr.), of counsel, Washington, DC, for defendants.

Garvey, Schubert & Barer (Eldon V.C. Greenberg) for intervenor-defendant and (Harold G. Bailey, Jr.) Washington, DC, for government of the Republic of Ecuador, amicus curiae.

*Opinion & Order*

AQUILINO, Judge:

Science and government have apparently come to agree that the turtles which have navigated Earth's oceans for millions of years may not survive modern human habits (and appetites) without the intervention of law. In the United States, the Congress has adopted the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, and more recently Pub.L. No. 101–162, 103 Stat. 988 (1989). Under ESA, four species of sea turtle have been listed as "endangered", while another is considered "threatened". The part of Pub.L. No. 101–162 which is at the core of this case, and which therefore must be set forth in toto, is as follows:

> Sec. 609. (a) The Secretary of State, in consultation with the Secretary of Commerce, shall, with respect to those species of sea turtles the conservation of which is the subject of regulations promulgated by the Secretary of Commerce on June 29, 1987—
>
> (1) initiate negotiations as soon as possible for the development of bilateral or multilateral agreements with other nations for the protection and conservation of such species of sea turtles;
>
> (2) initiate negotiations as soon as possible with all foreign governments which are engaged in, or which have persons or companies engaged in, commercial fishing operations which, as determined by the Secretary of Commerce, may affect adversely such species of sea

turtles, for the purpose of entering into bilateral and multilateral treaties with such countries to protect such species of sea turtles;

(3) encourage such other agreements to promote the purposes of this section with other nations for the protection of specific ocean and land regions which are of special significance to the health and stability of such species of sea turtles;

(4) initiate the amendment of any existing international treaty for the protection and conservation of such species of sea turtles to which the United States is a party in order to make such treaty consistent with the purposes and policies of this section; and

(5) provide to the Congress by not later than one year after the date of enactment of this section—

(A) a list of each nation which conducts commercial shrimp fishing operations within the geographic range of distribution of such sea turtles;

(B) a list of each nation which conducts commercial shrimp fishing operations which may affect adversely such species of sea turtles; and

(C) a full report on—

(i) the results of his efforts under this section; and

(ii) the status of measures taken by each nation listed pursuant to paragraph (A) or (B) to protect and conserve such sea turtles.

(b)(1) IN GENERAL.—The importation of shrimp or products from shrimp which have been harvested with commercial fishing technology which may affect adversely such species of sea turtles shall be prohibited not later than May 1, 1991, except as provided in paragraph (2).

(2) CERTIFICATION PROCEDURE. —The ban on importation of shrimp or products from shrimp pursuant to paragraph (1) shall not apply if the President shall determine and certify to the Congress not later than May 1, 1991, and annually thereafter that—

(A) the government of the harvesting nation has provided documentary evidence of the adoption of a regulatory program governing the incidental taking of such sea turtles in the course of such harvesting that is comparable to that of the United States; and

(B) the average rate of that incidental taking by the vessels of the harvesting nation is comparable to the average rate of incidental taking of sea turtles by United States vessels in the course of such harvesting; or

(C) the particular fishing environment of the harvesting nation does not pose a threat of the incidental taking of such sea turtles in the course to such harvesting.

103 Stat. at 1037–38, 16 U.S.C. § 1537 note. The controversy focuses on compliance with and enforcement of part (b) of this section 609.

I

The subject-matter jurisdiction of this court over the controversy has been established. *E.g., Earth Island Institute v. Christopher*, 6 F.3d 648 (9th Cir.1993). And in 19 CIT ——, 890 F.Supp. 1085 (1995), familiarity with which is presumed, the court denied defendants' threshold motion to dismiss part of the complaint.

By the time of that decision, the plaintiffs had interposed a motion for summary judgment, encompassing, among other requested relief, (a) a declaration that the defendants are not properly enforcing the foregoing section 609(b) by restricting its mandate to the Gulf of Mexico–Caribbean Sea-western Atlantic Ocean, failing to evaluate the actual incidental-sea-turtle-take comparability of each country covered by the statute and failing to impose import prohibitions on shrimp and shrimp products in a timely manner; (b) an embargo of that seafood from all countries covered by the statute unless and until the defendants have certified them as prescribed by section 609(b)(2); and (c) striking existing guidelines in regard thereto as violative of the Administrative Procedure Act. The defendants and the intervenor-defendant have now responded with motions of their own for

summary judgment. Necessarily in conformity with CIT Rule 56(i), each side has filed a statement of material facts as to which it contends there is no genuine issue to be tried. They are, among others:

♦ Based on studies conducted in the Gulf of Mexico and Atlantic Ocean, the Department of Commerce's National Marine Fisheries Service ("NMFS") issued regulations pursuant to ESA which now require U.S. shrimp trawlers in those waters to use approved turtle-excluder devices or "TEDs"[1] at all times.

♦ In the face of continuing concern over sea-turtle protection and of opposition by domestic shrimpers to the TEDs, Congress enacted section 609 in an effort to encourage similar regulatory measures for foreign shrimp trawlers.

♦ Australia, Bahrain, Bangladesh, Belize, Brazil, Brunei, Burma, Cameroon, Canada, Chile, China, Colombia, Costa Rica, Ecuador, Egypt, El Salvador, France, French Guiana, The Gambia, Ghana, Greece, Guatemala, Guyana, Haiti, Honduras, Hong Kong, India, Indonesia, Italy, Ivory Coast, Jamaica, Japan, Kenya, Kuwait, Madagascar, Malaysia, Mexico, Micronesia, Morocco, Mozambique, Namibia, New Zealand, Nigeria, Oman, Pakistan, Panama, Peru, Philippines, Republic of Korea, Republic of Seychelles, Republic of Singapore, Spain, Sri Lanka, Suriname, Taiwan, Tanzania, Thailand, Trinidad & Tobago, Tunisia, Turkey, United Arab Emirates and Venezuela have been identified, among others, as countries which have persons or companies engaging in commercial fishing practices which may affect adversely those species of sea turtle protected by U.S. law and which export shrimp or products of shrimp to the United States.

♦ The President has delegated his authority under section 609(b) to the Secretary of State, who, in turn, has relegated it to the Under Secretary of State for Economic and Agricultural Affairs.

♦ After consulting with the NMFS, the Department of State has issued guidelines for compliance with and enforcement of section 609(b).

♦ To date, the defendants have applied section 609 only to countries in the restricted ocean area(s), namely, Mexico, Belize, Guatemala, Honduras, Nicaragua, Costa Rica, Panama, Colombia, Venezuela, Trinidad & Tobago, Guyana, Suriname, French Guiana and Brazil.

♦ The defendants have not applied section 609 to date to the Pacific–Ocean fleets of Mexico, Guatemala, Honduras, Nicaragua, Costa Rica, Panama and Colombia.

♦ The defendants have not evaluated incidental sea-turtle-take-comparability statistics for foreign shrimp-fishing nations, presuming instead take levels equivalent to those for U.S. trawlers.

Of course, these are not the only facts material to this case: the others are referred to and relied on hereinafter. Nor can it be said that the parties are in agreement on all of them. Each side appears to agree, however, that the case can be finally decided on the motions presented; that is, there is no dispute over facts which requires trial.

After review and consideration of all of the papers presented, as well as a hearing held thereon, the court concurs. The dispositive issues raised are legal, and they now can be

1. By the time of the *Sea Turtle Conservation; Shrimp Trawling Requirements,* 52 Fed.Reg. 24,-244 (June 29, 1987), four such devices were approved, denominated as NMFS TED, Cameron TED, Matagorda TED and Georgia TED and discussed and depicted at pages 24,257–61 of that day's publication.

For developments since then, see, for example, *Sea Turtle Conservation; Shrimp Trawling Requirements,* 57 Fcd.Reg. at 33,452 *et seq.* (July 29, 1992) and at 41,703 *et seq.* (Sept. 11, 1992); 59 Fed.Reg. 33,697 (June 30, 1994); *Sea Turtle Conservation; Restrictions Applicable to Shrimp Trawling Activities; Additional Turtle Excluder Device Requirements Within Certain Statistical Zones,* 60 Fed.Reg. 21,741 (May 3, 1995); *Sea Turtle Conservation; Restrictions Applicable to Shrimp Trawling Activities; Leatherback Conservation Zone,* 60 Fed.Reg. 25,620 (May 12, 1995); *Sea Turtle Conservation; Restrictions Applicable to Shrimp Trawling Activities; Additional Turtle Excluder Device Requirements Within Certain Fishery Statistical Zones,* 60 Fed.Reg. 32,121 (June 20, 1995).

resolved properly by summary judgment.[2]

## II

While denying defendants' initial motion to dismiss Earth Island Institute, Todd Steiner, The American Society for the Prevention of Cruelty to Animals, The Humane Society of the United States and the Sierra Club as parties plaintiff for lack of standing, the court did concur in slip op. 95–103 that this issue of their standing had to be finally decided. 19 CIT at ——, 890 F.Supp. at 1094. That opinion relied on *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559, 112 S.Ct. 2130, 2135–36, 119 L.Ed.2d 351 (1992), wherein the Supreme Court reiterated that a party invoking federal jurisdiction always bears the burden of establishing that it has suffered injury in fact, that there is a causal connection between that injury and the conduct complained of, and that that injury is likely to be redressed by a favorable decision. 504 U.S. at 560, 112 S.Ct. at 2136. Since these three elements

> are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation. . . . At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." . . . In response to a summary judgment motion, however, the plaintiff can no longer rest on

such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed.Rule Civ.Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial."

504 U.S. at 561, 112 S.Ct. at 2136–37, citing or quoting from *Lujan v. Nat'l Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); and *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

### A

Initially, as indicated, the defendants did not challenge the standing of The Georgia Fishermen's Association, Inc. ("GFA") to be a party plaintiff herein, but they do so now. Their cross-motion for summary judgment takes the position that GFA has failed to adduce any evidence demonstrating injury-in-fact and that it has not established that the action(s) or inaction(s) of the defendants have caused it injury or that any such injury is likely to be redressed by a favorable decision.

■ The court concurs. Counsel for the plaintiffs have submitted an affidavit from GFA's president in support of their motion for summary judgment. Among other points, he states that GFA is an organization of commercial fishermen, seafood packers and suppliers primarily involved in the pro-

---

**2.** Upon answering the complaint, the defendants served and filed their Partial Motion to Dismiss

> (1) . . . plaintiffs' complaint in so far as it attempts to challenge the State Department's certification to Congress regarding the comparability of foreign countries' sea turtle protection programs, (2) . . . plaintiffs Earth Island Institute, Todd Steiner, the American Society for the Protection [*sic*] of Cruelty to Animals, the Humane Society of the United States, and the Sierra Club as parties to this action for lack of standing, and (3) . . . the Secretary of Commerce and the Assistant Administrator of the N[MFS] as defendants.

When the plaintiffs thereafter filed their motion for summary judgment, the defendants reacted with a motion to stay any consideration thereof, "[t]o avoid the possibility of deciding issues that are not justiciable, and to prevent working undue hardship upon the defendants", pending decision of their threshold motion. The stay was granted, in the interests of efficient proceedings, but not thereafter any part of defendants' substantive motion, which the court construed in slip op. 95–103 to be one for partial summary judgment as a result of defendants' joinder of issue and submission of matters outside of the pleadings. *See* 19 CIT ——, 890 F.Supp. 1085 *passim.*

duction and sale of shrimp harvested along the southeastern coast of the United States; that it was established in 1974 to more efficiently deal with issues facing the commercial shrimp fishing industry such as fair pricing of their product and compliance with state and federal regulations; that GFA has been instrumental in the development and implementation of TEDs[3] in the commercial shrimping fleets off the coast of Georgia; that, while he believes "using TEDs is the right thing to do, it is certainly unfair to require the expense of using TEDs only on domestic shrimping fleets"[4], which directly compete for the U.S. market with those of many countries around the world; and that, "if everyone in the shrimping industry were required to use TED[s], it would allow [GFA members] to compete evenly with foreign shrimpers."[5] While the court does not question these attestations (or any of the others in the affidavit), it is not able to conclude that they amount to proof of injury to GFA or its members or of the cause thereof sufficient to satisfy the standing requirements for proceeding to final judgment in this case against the defendants named above. Furthermore, the court has reviewed GFA's responses to written interrogatories seemingly served by the defendants in this regard and finds them also to be unsupportive. Specific, fundamental questions with respect to annual market shares, revenues and profits since 1986, for example, are unanswered.

---

**3.** The affiant states that, based upon his experience, he believes that

> the use of TEDs is a reasonable and sensible means of protecting endangered sea turtles without unduly burdening the shrimping industry. Nonetheless, each domestic shrimper who is required to use TEDs faces additional costs and expenses. During typical shrimping operations, each boat uses four nets while trawling, thus requiring four TEDs to be used at all times. Each boat must also maintain TEDs in the spare nets which are kept on hand in the event one or more of the trawl nets is damaged or destroyed by rock formations or abandoned wrecks. Each TED costs approximately $350 to $400 dollars ... and often[ ] the TED will need to be replaced at the end of the year. This places TED expenses at between two and three thousand dollars per boat per year.

Affidavit of Jack D'Antignac in Support of Plaintiffs' Motion for Summary Judgment, para. 3. He also believes that

As pointed out by the court in slip op. 95–103, the injury proven "need not be large"[6], but the Supreme Court has held that it must be "distinct and palpable", *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342, 97 S.Ct. 2434, 2440–41, 53 L.Ed.2d 383 (1977), or "concrete", *United States v. Richardson*, 418 U.S. 166, 177, 94 S.Ct. 2940, 2946–47, 41 L.Ed.2d 678 (1974). General allegations of economic disadvantage of the kind presented herein are not enough.

### B

Unlike GFA, the harm claimed by the other plaintiffs is not economic. Their complaint [para. 22] is that

> the inadvertent capture of turtles in shrimp trawls is a major factor in the mortality and decimation of [the endangered] species and significantly hinders recovery of their populations.

And the court concluded in slip op. 95–103 that their pleading was sufficient to withstand defendants' initial motion to dismiss. They were thus afforded an opportunity to adduce proof in opposition to the continuing defense of lack of standing.

An affidavit submitted on behalf of plaintiff The American Society for the Prevention of Cruelty to Animals states that it has some 350,000 members nationwide who share a commitment to the protection and welfare of

> TEDs affect ..., at most, between 5 to 10 percent of the catch, according to the area of the trawling. However, it is also important to note that during certain times of the year when ocean debris is typically high, TEDs allow trawling to continue for a longer period of time because the debris—like the sea turtles— escapes through the TED[s]. In certain circumstances, the quality of the catch is also improved because the large objects which might damage some of the catch are excluded through the TED[s].

*Id.*, para. 4.

**4.** Affidavit of Jack D'Antignac, para. 5.

**5.** *Id.*, para. 7.

**6.** 19 CIT at ——, 890 F.Supp. at 1095, quoting from *Jones v. Butz*, 374 F.Supp. 1284, 1288 n. 5 (S.D.N.Y.), *aff'd*, 419 U.S. 806, 95 S.Ct. 22, 42 L.Ed.2d 36 (1974).

all animals, including the endangered and threatened species of sea turtle; that it has national legislative and educational programs which focus, in part, on the prevention of abuse of animals by U.S. and foreign industry practices, "including the senseless drowning of sea turtles that occurs as a result of commercial shrimp fishing operations"[7]; and that it has participated in "a focused campaign ... to force the Mexican government to afford protection for the sea turtles and their nesting sites."[8]

An affidavit for The Humane Society of the United States states that it has 2.4 million members and that, in furtherance of its goals,

> The HSUS and its members have demonstrated a strong interest in preservation, enhancement, and humane treatment of wildlife, particularly threatened and endangered species, including sea turtles and marine mammals. Numerous members of The HSUS are concerned about the needless injury and killing of sea turtles that occurs as a result of inadequate implementation of regulations for TED usage by shrimp fleets. On behalf of its members, The HSUS has participated in virtually every aspect of international and U.S. government efforts to protect sea turtles and marine mammals and to regulate the incidental taking of these animals by commercial and military activities.

> 4. Members of The HSUS travel to sea turtle habitat [*sic*] throughout the world to photograph, study, observe and enjoy sea turtles in the wild, including areas of the Pacific and Caribbean Oceans, Mexico, and Latin America.

> 5. The HSUS staff has traveled to sea turtle habitats in Mexico and in Costa Rica to conduct undercover investigations and to record on videotape the plight of the sea turtles in these regions. The HSUS continues to monitor the status of sea turtles

in these and other locations throughout the world.[9]

In another affidavit, plaintiff Sierra Club is stated to be a national organization with over 500,000 members "committed to practicing and promoting the responsible use of the Earth's ecosystems and resources"[10]; that it has actively participated in efforts to effect systems of trade which protect, rather than harm, the long-term prospects for survival of endangered and threatened species, including sea turtles; and that many of its members travel to sea turtle habitats throughout the world, including areas of the Pacific and Caribbean, to photograph, study, observe and enjoy those turtles in the wild.

In response to defendants' written interrogatories, the ASPCA states that is has been involved in the observation and/or study of sea turtles since 1867, when its first annual report discussed their perceived plight, while the Sierra Club and Humane Society answer 1976 and 1981, respectively. Dr. John Grandy is identified specifically as a member of the Humane Society who has

> participated in sea turtle eco-tours, has observed nesting sea turtles in the United States and elsewhere, and has been a representative to governmental meetings designed to aid the plight of sea turtles through the use of TEDs and other techniques. In his responsibilities with The HSUS, Dr. Grandy has requested and directed investigations including the production of video on the status of sea turtles and their conservation in both Costa Rica and Mexico.[11]

Another answer indicates that he will be visiting over the next year or so areas of sea turtle habitat in Central America for the purpose of observation and study.[12]

Although accepting the foregoing representations, the defendants nonetheless adhere to their position that

---

7. Affidavit of Jamie Cotel, para. 3.

8. *Id.*, para. 4.

9. Affidavit of John Grandy, paras. 3–5.

10. Affidavit of Alex Levinson, para. 2.

11. Plaintiffs' Response to Defendants' Modified Interrogatory No. 4, p. 24.

12. *See* Plaintiffs' Response to Defendants' Modified Interrogatory No. 5, p. 29.

these paragraphs state precisely the "vocational interest" in the problem of sea turtle drownings rejected by the Supreme Court in *Defenders of Wildlife*. Consequently, the mere interest of these environmental organizations and their members in the preservation of sea turtles cannot establish the requisite injury-in-fact.

Defendants' Memorandum, p. 16. In the case relied on, "organizations dedicated to wildlife conservation and other environmental causes" [13] challenged a regulation, reinterpreting ESA to require federal-agency consultation only for actions taken by them in the United States or on the high seas. The precise claim of injury to the plaintiffs in that case was that the lack of consultation between agencies with respect to certain funded activities abroad "increase[es] the rate of extinction of endangered and threatened species." 504 U.S. at 562, 112 S.Ct. at 2137.

▪ Clearly, the injury claims of the plaintiff ASPCA, Humane Society and Sierra Club here are not so attenuated. As the Supreme Court reaffirmed in *Defenders of Wildlife*:

> ... Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing.

504 U.S. at 562–63, 112 S.Ct. at 2137. Furthermore:

> ... Standing ... as we have said requires, at the summary judgment stage, a factual showing of perceptible harm. It is clear that the person who observes or works with a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist. It is even plausible— though it goes to the outermost limit of plausibility—to think that a person who observes or works with animals of a particular species in the very area of the world where that species is threatened by a federal decision is facing such harm, since some animals that might have been the subject of his interest will no longer exist, see *Japan Whaling Assn. v. American*

*Cetacean Society*, 478 U.S. 221, 231, n. 4 [106 S.Ct. 2860, 2866, n. 4, 92 L.Ed.2d 166] (1986). It goes beyond the limit, however, and into pure speculation and fantasy, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection.

504 U.S. at 566–67, 112 S.Ct. at 2139–40 (footnote omitted). Suffice it to state that this court cannot and therefore does not find that the foregoing three named plaintiffs are within the realm of "pure speculation and fantasy" here, that is, that they fail to show any "perceptible harm" or to show they are within the "zone of interests to be protected by the statute" in question. *Director, Office of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.,* —— U.S. ——, ——, 115 S.Ct. 1278, 1283, 131 L.Ed.2d 160 (1995), quoting *Ass'n of Data Processing Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

### C

▪ Indeed, the defendants concede such harm to plaintiffs Earth Island Institute and Todd Steiner, albeit according to them geographically limited. *See, e.g.,* Defendants' Memorandum, pp. 18–23. A lengthy affidavit submitted by Mr. Steiner attests that the Earth Island Institute has approximately 35,-000 members worldwide, including himself; that as a trained biologist he has conducted research on endangered sea turtles in Florida and in Mexico, Nicaragua and Ecuador; that the Institute created a Sea Turtle Restoration Project in 1989 to help alleviate the dramatic decline in the worldwide turtle populations resulting from various human activities, including uncontrolled mass slaughter, plundering of turtle nests, the degradation of nesting beaches due to human development in coastal habitats and the inadvertent capture of turtles in shrimp trawls; that he is the Director of the Restoration Project, which includes marine and research biolo-

**13.** *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559, 112 S.Ct. 2130, 2135–36, 119 L.Ed.2d 351 (1992).

gists, professional photographers, artists, writers and videographers who are engaged in the study, protection, documentation, enhancement, conservation and preservation of endangered and threatened sea turtles; that those species are "circumglobally" distributed and may migrate thousands of miles annually through waters of more than one country; and that

> [a]lthough only scant data is [sic] available on mortality of sea turtles caused by the shrimping fleets of other nations, a rough estimate of actual mortality can be made by assuming that sea turtles are captured by the fleet[s] of other nations at the same rate as the United States fleet. Using the low estimate of mortality (11,000 turtle deaths annually in the United States), and based on the fact that the United States harvests eight percent of the wild shrimp caught worldwide, it is estimated that more than 124,000 sea turtles drown annually due to shrimping by all other nations. This represents the death of more than 340 sea turtles every day when TEDs are not used.

12. Moreover, there are a number of reasons to believe that the mortality of sea turtles caused by foreign fleets is even higher than these numbers suggest. Many sea turtles that are caught and released alive by United States shrimpers (and thus are not included in mortality figures) are probably slaughtered for their meat, eggs or shells by foreign fleets. Furthermore, populations of sea turtles in many regions of the world are significantly larger than off the coast of the United States and thus, sea turtle-shrimping interactions are more likely to occur. For example, we now have preliminary data to suggest that approximately 20,000 sea turtles are captured by the Costa Rican Pacific fleet which only has around sixty vessel [sic] . . . .

Affidavit of Todd Steiner, paras. 1–4, 9, 11–12. Answers to defendants' written interrogatories further indicate that Mr. Steiner travelled to the Pacific coast of Nicaragua in October and November 1987, in October 1988, and again in July 1992 to observe and study leatherback and olive ridley sea turtles; that he went in October and November 1989, in May 1990, and also in October of 1991 and 1992 to various parts of Mexico for similar observation and study, returning to that country in May 1994 to interview government officials and citizens regarding trade there in turtle products; and that he travelled to Guayaquil, Ecuador in February 1993 to, among other things, observe and film the use of TEDs in shrimp-trawl nets. Plaintiffs' answers also state that a member of Earth Island's Sea Turtle Restoration Project's Scientific Advisory Board, Dr. Peter C.H. Pritchard, has over the past 30 years observed and studied every species of sea turtle in the oceans and on the beaches of Mexico, Costa Rica, Honduras, Micronesia, Ecuador, Papua New Guinea, Guyana, Suriname, French Guiana, Venezuela, France, Seychelles, Kenya, South Africa, Bangladesh, India, Thailand and Australia and that he is the author of five books and over 100 scientific papers and research reports about turtles. A member and research associate of the Restoration Project, Dr. Duane R. McPherson, is stated to have been involved in sea-turtle research and conservation biology for over 20 years and to have extensively studied sea turtles, including the reproductive biology of loggerheads on Ossabaw Island, Georgia and of green sea turtles in the Galapagos Islands, and the respiration and exercise physiology of green turtles at Tortuguero, Costa Rica. In addition to those countries, Dr. McPherson has visited beaches of Nicaragua in the summers of 1987, 1990 and 1991 to observe and study sea turtles. In August 1995, he returned to Costa Rica to make arrangements to take students during the summer of 1996 to that country's beaches on both the Pacific and Caribbean to study the natural history and reproductive biology of olive ridley and green sea turtles and "the sociological issues that surround conservation planning at the beaches and in the ocean waters through which the turtles migrate." [14] Answers to defendants' interrogatories also indicate that plaintiff Steiner expects to travel to Mexico, Costa Rica, Cayman Islands, Japan and Thailand in an effort to continue a

14. Plaintiffs' Response to Defendants' Modified Interrogatory No. 5, p. 28.

sea-turtle video project begun in 1982 and that in January or February 1996 he expects to travel to Gahirmatha Beach in the Bhitarkanika Reserve of India to observe olive ridley and possibly other species of sea turtle. Dr. Pritchard is stated to intend to travel in 1996 three times to Guyana, starting in March, to continue his long-term research there, including the observation and study of leatherback, olive ridley, green and hawksbill sea turtles, and twice to Costa Rica, as well as to Vietnam (within the next two years) and to Senegal and Suriname. In addition to the aforenamed participants in plaintiff Earth Island Institute's Sea Turtle Restoration Project, another member, Juan Carlos Cantu, is resident in Bosques De Las Lomas, Mexico, while Randall Arauz Vargas is a biologist who lives and works out of San Jose, Costa Rica, visiting over the past eleven years "nearly every sea turtle habitat"[15] in that country, as well as travelling to Nicaragua and Guatemala.

### D

As indicated in the foregoing section, the defendants attempt to limit their concession of injury suffered or to be suffered by plaintiffs Earth Island Institute and Steiner to Mexico, Nicaragua and Costa Rica. Moreover, they argue that none of the "environmental plaintiffs" has established the requisite causation and that their injuries are not likely to be redressed by a favorable decision. Defendants' Memorandum, p. 30–44. They cite *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984), to the effect that a "plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."

### (1)

What the plaintiffs claim in this regard is not that humans continue to kill Earth's ancient reptiles but that the law Congress has concluded to enact to diminish that phenomenon in conjunction with the worldwide pursuit of wild shrimp for American tables is not being fully enforced by the defendants, "which has threatened particular species of animals in the areas where such species are studied and enjoyed by plaintiffs." Plaintiffs' Supplemental Memorandum, p. 10. They rely on *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986), wherein the Court noted that the failure of the Secretary of Commerce to certify certain countries for violating whaling quotas caused the plaintiffs, one of which was the Humane Society, injury in fact.

With regard to whether the relief the plaintiffs request is likely to redress their harm, a document apparently prepared under the auspices of the NMFS *sub nom.* Preliminary Evaluation of U.S. Turtle Protective Measures Under Existing TED Regulations and Recommended Standards for Implementation of Section 609, Public Law 101–162 and produced in this case states, in part:

> Full implementation of TEDs in foreign shrimp trawl fisheries will minimally result in a 97% reduction in turtle catch, and a 97% reduction in mortalities. This exceeds U.S. standards, and any foreign nation adopting such regulations will be in full compliance with the shrimp embargo legislation.[16]

While this document recognizes "the difficulties in implementing this legislation because so little is known about the fisheries of nations [ex]porting shrimp to the U.S."[17], it recommends:

> On a country-by-country basis, the most meaningful standard might be "percent reduction" in turtle mortalities. For example, U.S. TED regulations have resulted in a 62% annual reduction in turtle mortalities by shrimp trawlers. If a foreign nation can demonstrate that their regulations have resulted in a similar or greater reduction in mortalities, they will have met the comparability standard of the law.

---

**15.** Plaintiffs' Response to Defendants' Modified Interrogatory No. 4, p. 23.

**16.** Affidavit of Nicole Walthall in Support of Plaintiffs' Reply and Opposition Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendants' and Defendant–Intervenor's Cross–Motions for Summary Judgment, Exhibit A, p. 17.

**17.** *Id.* at 16.

This is a relatively easy standard for many foreign nations to meet. By requiring and enforcing TED regulations, for example, foreign nations can expect to reduce turtle catch and mortalities by 97%, regardless of whether the remaining 3% of the turtles are eaten or sold. Furthermore, if the standard dealt strictly with "percent reduction," it may not be necessary to have an accurate estimate of CPUE. We know that TEDs are at least 97% effective in eliminating turtle captures, if properly installed and used. Thus, if CPUE in foreign waters were a magnitude greater than the U.S. standard, year-round implementation of TEDs would probably still reduce mortalities *more* than the existing U.S. regulations.[18]

This document lists Ecuador, Mexico, China, Thailand, Taiwan, Panama, Brazil and India as the top eight shrimp exporting nations to the United States, while more recent data show Thailand, Ecuador, Mexico, India, China, Indonesia, Bangladesh and Honduras to be those countries. *See* U.S. Dep't of Commerce, Fisheries of the United States, 1994, at 46 (Aug. 1995). As shown above and discussed hereinafter, to date the defendants have enforced section 609 only with regard to the eastern coasts of Mexico, Honduras and Panama and to Brazil.

The government of Ecuador has sought and obtained leave to file a brief *amicus curiae*. Its submission leaves no doubt that at least that government is aware of the statute's significance and this case's potential consequences. The same can be said of the National Fisheries Institute, Inc. ("NFI"), which obtained leave to intervene herein as a party defendant. In its motion to intervene, NFI is described as a national trade association with approximately 1,000 member companies involved in the fish and seafood industry in the United States, including producers, processors, wholesalers, distributors, retailers, brokers and importers:

The level of involvement of NFI's membership with imported shrimp reflects the importance of this product to the entire U.S. seafood market. According to U.S. Department of Commerce statistics, in 1993, about 601 million pounds of shrimp were imported into the United States, valued at roughly $2.17 billion. This represented approximately 37% of the value of total U.S. imports of edible seafood products. These imports, moreover, make up the vast majority of U.S. consumption, with imported shrimp accounting for approximately 80% of domestic consumption and domestically-produced shrimp accounting only for approximately 20%. Because of the seasonality of U.S. shrimp production—landings are highest in the third and fourth quarters and peak during the summer months—the actual dependence of the market on imports may even be higher during some times of year. Finally, trade in shrimp is worldwide in scope. In 1993, more than seventy countries on all continents exported shrimp to the United States.

Declaration of Richard F. Gutting, Jr., para. 4. If this is the nature of the market, it seems safe to presume that the exporting countries do (and would) attempt to comply with U.S. law. Stated another way, the court cannot find on the record developed that the personal injury the plaintiffs allege is not fairly traceable to defendants' allegedly unlawful conduct and likely to be redressed by the requested relief.

None of the cases the defendants attempt to rely on indicates a contrary decision on the issue of the standing of the plaintiffs, save GFA, to prosecute this case to judgment.[19] *Whitmore v. Arkansas*, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), held that a third person lacked standing to challenge the validity of a death sentence imposed on a defendant who elected to forego his right of appeal to a state court of last resort. The Supreme Court concluded in *ASARCO Inc. v. Kadish*, 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1988), that indi-

---

**18.** *Id.* (emphasis in original). CPUE is stated elsewhere to stand for "turtle catch per unit of effort". *Id.* at 4.

**19.** *Cf. Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute").

vidual taxpayers and an association of school teachers did not have standing to challenge mineral leases on state lands as violative of federal land grants in trust for the support of public schools. In *Animal Legal Defense Fund v. Quigg*, 932 F.2d 920 (Fed.Cir.1991), the court of appeals decided that the plaintiff ASPCA and others of similar concern lacked standing to challenge a rule of the Patent and Trademark Office regarding patents of man-made living micro-organisms "including animals" as violative of the APA and of the Patent Act. Members of Congress and organizations and individuals opposed to apartheid and nuclear proliferation were held in *Dellums v. U.S. Nuclear Regulatory Comm'n*, 863 F.2d 968 (D.C.Cir.1988), to be without standing to petition for review of licenses to import uranium from South Africa as contrary to the Comprehensive Anti–Apartheid Act of 1986, while the lack of standing of other Congressmen and individuals to compel Customs to bar products which "may have been" of slave labor in the U.S.S.R. was affirmed in *McKinney v. U.S. Dep't of the Treasury*, 799 F.2d 1544 (Fed. Cir.1986). Finally, the claims of the plaintiffs in *American Jewish Congress v. Vance*, 575 F.2d 939 (D.C.Cir.1978), regarding cooperative programs between the United States and Saudi Arabia, which excludes "undesirable persons" from its territory, did not establish their standing to obtain relief against the U.S. government due to its programs' "chilling effect on their pursuit of economic opportunities."

In yet another case cited by the defendants, *Nat'l Wildlife Federation v. Hodel*, 839 F.2d 694, 701 (D.C.Cir.1988), the evidence adduced in the district court led the circuit court to affirm the standing of the plaintiff Wildlife Federation, Sierra Club *et alia* to pursue their claims as to the implementation of the Surface Mining Control and Reclamation Act of 1977, which established "a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." The court of appeals pointed out that "[r]edressability

and causation analyses often replicate one another, particularly in cases where ... the relief requested is merely the cessation of illegal conduct." 839 F.2d at 705.

> A party seeking judicial relief need not show to a certainty that a favorable decision will redress his injury. A mere likelihood will do.... [A] plaintiff need not "negate every speculative and hypothetical possibilit(y) ... in order to demonstrate the likely effectiveness of judicial relief."

839 F.2d at 705, 706, citing *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Int'l Ladies Garment Workers' Union v. Donovan*, 722 F.2d 795 (D.C.Cir.1983), *cert. denied sub nom. Breen v. Int'l Ladies Garment Workers' Union*, 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984); and quoting *Community Nutrition Inst. v. Block*, 698 F.2d 1239, 1249 (D.C.Cir.1983), *rev'd on other grounds*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984).

### (2)

The likely effectiveness of judicial relief in this case is clearly indicated by the results of the defendants' enforcement of section 609 in the Gulf of Mexico—Caribbean Sea—western Atlantic Ocean. Their most recent Certification to The Congress, for example, dated April 28, 1995, is that Mexico, Brazil, Venezuela, Colombia, Honduras, Nicaragua, Guyana, Panama and Belize "have provided evidence of the adoption of a regulatory program governing the incidental capture of sea turtles in the commercial shrimp fishery comparable to the program in the United States". Trinidad and Tobago, Suriname and French Guiana were not so certified because they "ha[d] not provided the necessary documentary evidence to support such a certification", whereupon imports of shrimp from each of those countries were prohibited, effective May 1, 1995.[20] Guatemala and

---

**20.** *See Certifications Pursuant to Section 609 of Public Law 101–162,* 60 Fed.Reg. 24,962 (May 10, 1995). That public notice points out the continuation of the ban on such imports from

Suriname (in effect since May 1, 1993) and from French Guiana (in effect since May 1, 1992).

As for Trinidad and Tobago, the embargo was lifted in August 1995. *See Bureau of Oceans and*

Costa Rica are certified as not posing a threat of the incidental taking of sea turtles on the ground that their commercial shrimp fleets operate along their Pacific coasts and not in the Caribbean. The Certification goes on to report:

> ... The Department of State will remain in close contact with each of the affected countries during the next year in order to ensure that they are continuing to implement and enforce their programs. Certification on May 1, 1996 will depend, *inter alia*, upon the extent to which each country continues to implement and enforce the requirement to use TEDs on all commercial shrimp trawl vessels operating in the Caribbean, Gulf of Mexico and Western Atlantic Ocean during the next year.

Seemingly in view of the administrative approach and reported results to date in the geographic region indicated, as well as of plaintiffs' activities therein, the defendants seek to restrict their concession of injury to Earth Island Institute and Todd Steiner to the Pacific coasts of Mexico, Nicaragua and Costa Rica. But in the referenced Certification of April 28, 1995, the Department of State

> stress[es] once again, to the Congress and to other countries whose commercial shrimp fisheries may adversely affect sea turtles, its commitment to promoting, as a matter of policy, equivalent measures to protect sea turtles in other areas where sea turtles are taken incidental to commercial shrimp fishing operations.

Indeed, subsequent to the hearing on the cross-motions for summary judgment, the defendants have filed a declaration by the Acting Assistant Secretary of State for Oceans and International Environmental and Scientific Affairs affirming, among other activities:

> Well before the enactment of Section 609, and continuing since the enactment of that statute, the Executive Branch has sought to protect and conserve sea turtles on an international basis ..., including under the auspices of the Convention on

*Int'l Environmental and Scientific Affairs; Certifications Pursuant to Section 609 of Public Law*

International Trade in Endangered Species of Wild Fauna and Flora, which prohibits such trade in sea turtles and sea turtle parts, and the Protocol on Specially Protected Areas and Wildlife to the Convention for the Protection and Development of the Marine Environment of the Wider Caribbean Region. The Executive Branch has promoted the use of turtle excluder devices (TEDs) and other techniques for protecting sea turtles in many regions of the world, and has conducted cooperative research programs on sea turtles with other nations, particularly with Mexico. More recently, the Executive Branch responded positively to a request by India's Orissa State, where the world's largest olive ridley sea turtle rookery is located, to conduct a workshop in the use of TEDs, tentatively scheduled for January 1996.

Declaration of David A. Colson, para. 11. And, on their part, the plaintiffs have just submitted an affidavit by the Director of the University of Florida Genetic Analysis Core of Biotechnologies for the Ecological, Evolutionary, and Conservation Sciences at the Biotechnology Development Institute to the effect that he has studied the migratory behavior of endangered and threatened sea turtles for a number of years and that

> conclusive scientific evidence indicates that populations of species of sea turtles found in U.S. territorial waters and the Gulf of Mexico[ ] migrate throughout wide expanses of the ocean.

Affidavit of Brian W. Bowen, para. 7.

In short, from both sides it appears that the threats to the survival of the sea turtles are worldwide and that their respective interests are not narrower.

### III

The question remains, however, whether or not those interests can be advanced via this litigation.

*101–162,* 60 Fed.Reg. 43,640 (Aug. 22, 1995).

## A

Slip op. 95–103 concluded, as had the U.S. District Court for the Northern District of California and the Court of Appeals for the Ninth Circuit earlier *sub nom. Earth Island Institute v. Baker,* 1992 WL 565222, 1992 U.S.Dist. LEXIS 8604 (Aug. 6, 1992), *aff'd,* 6 F.3d 648 (9th Cir.1993), that jurisdiction over plaintiffs' claims under section 609 rests exclusively with this Court of International Trade pursuant to 28 U.S.C. § 1581(i)(3) and (4). When this is the predicate of subject-matter jurisdiction, a case "is barred unless commenced in accordance with the rules of the court within two years after the cause of action first accrues." 28 U.S.C. § 2636(i).

The defendants and intervenor-defendant argue that this case is barred by that statute of limitation. The gravamen of the government's position is stated as follows:

> ... Plaintiffs' complaint challenges the defendants' guidelines for making certifications under Section 609. Complaint at ¶¶ 27–29. These guidelines were first published on January 10, 1991, and have remained unchanged in all respects relevant to plaintiffs' claims in this action. Thus, the agency action which gave rise to plaintiffs' cause of action accrued on January 10, 1991. The deadline for filing such an action, therefore, expired on January 10, 1993. Because plaintiffs did not file this action until after that date, on June 3, 1994, plaintiffs' claims are time-barred.

Defendants' Memorandum, p. 47 (footnote omitted). Among other arguments, NFI adds that the plaintiffs "notably never sought to invoke 28 U.S.C. § 1631 at any stage of the Ninth Circuit proceedings or otherwise to request a transfer of the case." Memorandum of Defendant–Intervenor, p. 26.

The plaintiffs counter (1) that the court should deem the case transferred per the statute the intervenor-defendant cites and Ninth Circuit case law thereunder;[21] (2) that the court should exercise its equity powers to hold the running of the period of limitation during the pendency of the original action in California tolled; (3) that their claims accrue

anew each year the defendants fail to certify those countries which have shrimping operations adversely affecting sea turtles; or (4) that, insofar as this case challenges agency regulation(s), the statute of limitation does not apply. *See* Plaintiffs' Reply and Opposition Memorandum, pp. 22–32.

To the extent the plaintiffs continue to complain of the *Turtles in Shrimp Trawl Fishing Operations Protection; Guidelines,* 56 Fed.Reg. 1,051 (Jan. 10, 1991), any claim to relief thereon is now moot. The court concludes after reviewing and comparing them with the *Revised Guidelines for Determining Comparability of Foreign Programs for the Protection of Turtles in Shrimp Trawl Fishing Operations,* 58 Fed.Reg. 9,015 (Feb. 18, 1993), that they have been superseded. Indeed, contrary to defendants' above representation that they "have remained unchanged in all respects relevant to plaintiffs' claims in this action", the 1991 version announced that the

> foundation of the U.S. program is the requirement that shrimp trawl vessels use approved TEDs in areas and at times when there is likelihood of intercepting sea turtles[22]

while the 1993 notice states:

> The Department of State's original guidelines published on January 10, 1991[] were based on the U.S. domestic regulations in effect at that time and established a similar requirement for foreign countries in developing a program comparable to the U.S. program. The guidelines provided two ways to meet the criteria for reduction in incidental taking in paragraph I(A)–(3). The first option was to require the use of TEDS on all vessels at all times. The second option was "to engage in a statistically reliable and verifiable scientific program to determine times and areas of turtle abundance; to develop and assess technologies to reduce the impact of the shrimp trawl fishery on sea turtles; and to require the use of fishing technologies and techniques that will reduce the incidental mortality of sea turtles in the

21. *E.g., Kolek v. Engen,* 869 F.2d 1281 (9th Cir. 1989).

22. 56 Fed.Reg. at 1,051.

shrimp trawl fishery to insignificant levels."

Under the second option, it was anticipated that TEDs might not be required in some areas and times if it could be determined that the level of the incidental capture in those areas and times did not warrant their use.... [T]he revised guidelines contained in this notice eliminate the second option as a basis for certification and establish clearly the use of TEDs in all areas at all times as the principal, but not the only, requirement for the mandated certification.

The primary reason for the change in the guidelines is to bring them into line with the U.S. domestic program in light of recent changes in U.S. regulations which considerably expanded the TEDs requirement in the United States shrimp fishery. With the limited exemptions noted below, beginning January 1, 1993, all U.S. commercial shrimp trawl vessels in the waters of the Gulf of Mexico and the Atlantic Ocean from North Carolina to Texas must use TEDs at all times in all areas.

58 Fed.Reg. at 9,016.

■ Insofar as such guidelines under the guise of section 609 are of moment in this case, clearly, those promulgated in February 1993—or less than two years prior to the filing of plaintiffs' current complaint—are the ones in issue. Moreover, the primary focus of this case is, and must be, on the underlying statute, subsection (b)(2) of which requires certification by the President not later than May 1 each annum. And, given the nature of the relief prayed for in regard thereto, the court cannot conclude that the passage of time now bars the plaintiffs from continuing its pursuit.

### B

■ That relief includes a request for judicial remand of the guidelines "for adequate opportunity for public review and comment." Complaint, p. 16, para. 3. While such opportunity is generally required for executive-branch rules and regulations, the Administrative Procedure Act does except "a military or foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). And the defendants invoke this exemption herein, which defense the court sustains on the facts and circumstances of this case. *Compare, e.g., American Ass'n of Exporters and Importers—Textile and Apparel Group v. United States,* 751 F.2d 1239 (Fed.Cir.1985) (regulations implementing Arrangement Regarding International Trade in Textiles within ambit of APA foreign-affairs exception); *American Inst. for Imported Steel, Inc. v. United States,* 8 CIT 314, 600 F.Supp. 204 (1984) (U.S. embargo of European steel pipe and tube a foreign affairs function).

### C

As for the import prohibition contemplated at bar, both promulgations of the guidelines report that the Department of State has determined that it "does not apply to aquaculture shrimp, since the harvesting of such shrimp does not adversely affect sea turtles" and that "the scope of section 609 is limited to the wider Caribbean/western Atlantic region"[23] based upon the following published rationale:

Section 609 refers to sea turtles whose conservation is the subject of U.S. regulations that require, among other things, that shrimp trawl vessels fishing in U.S. waters of the Atlantic and the Gulf of Mexico from North Carolina to Texas use turtle excluder devices (TEDs) or reduced tow times to reduce the incidental mortality of sea turtles in trawl operations. In passing section 609, Congress recognized that these conservation measures taken by U.S. shrimp fishermen would be of limited effectiveness unless a similar level of protection is afforded throughout the turtles' migratory range across the Gulf of Mexico, Caribbean and western Atlantic Ocean.

58 Fed.Reg. at 9,015–16. *See also* 56 Fed. Reg. at 1,051.

### (1)

In support of this approach, counsel argue that section 609(b) is silent on the geographic scope of its implementation and that defen-

---

**23.** *Id.* and 58 Fed.Reg. at 9,015.

dants' delimitation to the wider Caribbean is reasonable. *See generally* Defendants' Memorandum, pp. 51–56.

■ The starting point in every case involving construction of a statute is the language itself. *E.g., Madison Galleries, Ltd. v. United States,* 870 F.2d 627, 629 (Fed.Cir. 1989), citing *Bethesda Hospital Ass'n v. Bowen,* 485 U.S. 399, 108 S.Ct. 1255, 99 L.Ed.2d 460 (1988); *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *Watt v. Alaska,* 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981).

> ... If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted).

■ Here, the court finds the statute Congress has decided to enact to be clear and unambiguous in regard to its scope. Its language includes *"all* foreign governments which are engaged in, or which have persons or companies engaged in, commercial fishing operations which ... may affect adversely [endangered or threatened] species of sea turtles"[24] and "protection of specific ocean and land *regions* which are of special significance to the health and stability of such species of sea turtles"[25] and "amendment of *any* existing international treaty for the protection and conservation of such species of sea turtles to which the United States is a party"[26] and *"each* nation"[27] which conducts commercial shrimp fishing operations within the geographic range of distribution of such sea turtles and which may affect them adversely. No language of section 609 restricts its geographical purview, nor can the court accept the premise that the statute is simply silent on the matter.

On their part, defendants' able counsel extrapolate the following argument from the above-quoted, published rationale of the guidelines:

> In deciding how to interpret congressional silence regarding the geographic scope of Section 609(b), defendants considered the fact that the requirements of that provision are modified by the language of Section 609(a), which applies to "those species of sea turtles the conservation of which is the subject of regulations promulgated by the Secretary of Commerce on June 29, 1987." ... The regulations referenced in Section 609, in turn, only apply to shrimp trawlers in the Gulf of Mexico and the Atlantic Ocean off the southeastern United States, and were based on studies that focused on these areas.

Defendants' Memorandum, pp. 52–53 (footnote omitted). But, as this contention concedes and the statutory language confirms, species of sea turtles are the predicate of section 609, not where on Earth they might be found from time to time. The referenced regulations of the Department of Commerce, National Oceanic and Atmospheric Administration *sub nom. Sea Turtle Conservation; Shrimp Trawling Requirements,* 52 Fed. Reg. 24,244 (June 29, 1987), report as background the following:

> All sea turtles that occur in U.S. waters are listed as endangered or threatened species under the Endangered Species Act of 1973, 16 U.S.C. 1531 *et seq.,* (ESA or the Act). Five of these, the loggerhead (*Caretta caretta*), Kemp's ridley (*Lepidochelys kempi*), green (*Chelonia mydas*), leatherback (*Dermochelys coriaceia*) and hawksbill (*Eretmochelys imbricata*), are found

24. Section 609(a)(2) (emphasis added).

25. Section 609(a)(3) (emphasis added).

26. Section 609(a)(4) (emphasis added).

27. Section 609(a)(5)(A), (B) and (C) (emphasis added).

in marine waters from North Carolina through Texas, where there is a significant incidental mortality of sea turtles in shrimp trawls.

The Act prohibits captures of endangered sea turtles within the United States, within the U.S. territorial sea, and on the high seas, except as authorized by the Secretary of Commerce or the Secretary of the Interior. The Secretary of Commerce has authority over sea turtles in marine waters and the Secretary of the Interior has authority over sea turtles on land. The Act authorizes the respective Secretaries, by regulation, to extend to threatened species the protections provided by statute to endangered species.

In slip op. 95–103, this court found that ESA is part of plaintiffs' complaint *passim* [28] and also concluded that section 609 supplements ESA and can, if not should, be read in *pari materia.* 19 CIT at ——, 890 F.Supp. at 1092. In *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), a controversy over completion of a federal dam of the Little Tennessee River to the possible extinction of a species of perch called the snail darter, the Court opined:

> ... The plain intent of Congress in enacting this statute [ESA] was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute. All persons, including federal agencies, are specifically instructed not to "take" endangered species, meaning that no one is "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" such life forms.... Agencies in particular are directed by §§ 2(c) and 3(2) of the Act to "use ... *all methods* and procedures which are necessary" to preserve endangered species.... In addition, the legislative history undergirding § 7 reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species. The pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the "primary missions" of federal agencies.[29]

And the Supreme Court remains of this opinion to the present. *See, e.g., Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* —— U.S. ——, ——, 115 S.Ct. 2407, 2413, 132 L.Ed.2d 597 (1995).

As in *Hill,* the government attempts to invoke legislative history in favor of its reading of the statutory language at issue. The effort is of little avail. To begin with, there is hardly any history. And while that which has been brought to the court's attention does tend to focus, as the defendants and intervenor-defendant assert, on the oceanic region of their choice,[30] such focus does not mean that either the legislative process itself or, more importantly, the adopted result thereof was or is so restricted. That members of the U.S. Senate and House of Representatives from Gulf-coast states may have voiced on the record their concerns and expectations does not constrict in any way the effect of the votes of other members in support of this ESA-related legislation.

### (2)

Under section 609 as enacted, the President must and has reported to Congress, albeit only about the "wider Caribbean". The court finds the real reason for this approach to have been revealed in the November 1990 Report of the Secretary of State to The Congress of The United States on the Status of Efforts for the Conservation and Protection of Sea Turtles Pursuant to Section 609 of P.L. 101–162, to wit:

> ... [W]hile the Department of State supports fully the goals of Section 609 and the intent of the Congress in enacting this legislation, the specific language of the law presents problems and difficult choices.

---

**28.** 19 CIT at ——, 890 F.Supp. at 1093.

**29.** 437 U.S. at 184–85, 98 S.Ct. at 2296–97 (emphasis in original; footnote and statutory citations omitted).

**30.** *See generally* Defendants' Memorandum, pp. 52–56; Memorandum of Defendant–Intervenor, pp. 40–43.

Because four of the five species protected under the U.S. regulations are known to occur worldwide, this law, if given the broadest possible interpretation, could affect shrimp imports from more than 80 countries totalling as much as $1.8 billion—more than 75 percent (by value) of all shrimp consumed in this country. The impact of the resulting embargoes would be unprecedented both internationally and domestically.

In implementing the law, the Administration has proceeded on the assumption that Congress intended to take reasonable steps internationally to protect sea turtles but did not intend to force a situation that would create enormous market disruptions in the United States and create major foreign policy problems with many countries.[31]

Whereupon the approach intimated earlier in testimony by the Deputy Assistant Secretary of State for Oceans and Fisheries Affairs[32] was proclaimed in the report to be the one to be followed *viz.:*

... The Administration therefore understands Section 609 to be limited to an effort by the Congress to extend the protection given to threatened and endangered sea turtles protected by U.S. regulations only to those turtles throughout their range across the Gulf of Mexico, Caribbean, and the western central Atlantic (or, more simply, the wider Caribbean).

And it has been followed since that time.[33]

The defendants now argue that Congress has acquiesced in this limited approach and that the court should therefore uphold it. They cite for support *Saxbe v. Bustos,* 419 U.S. 65, 74, 95 S.Ct. 272, 279, 42 L.Ed.2d 231 (1974), wherein the Court opined that a

longstanding administrative construction is entitled to great weight, particularly when, as here, Congress has revisited the Act and left the practice untouched. Such a history of administrative construction and congressional acquiescence may add a gloss or qualification to what is on its face unqualified statutory language.

Of course, the approach at bar is not longstanding, nor, according to the record developed, has Congress revisited section 609—or even been asked to do so by either President responsible to date for its enforcement. By way of comparison, the Court found in *Saxbe* in 1974 that the immigration practice at issue dated back at least to 1927. *Cf. Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) (Congress failed to enact any of 13 bills introduced over twelve years to reverse IRS denial of tax-exempt status to discriminatory private schools); *Zenith Radio Corp. v. United States,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978) (five acts of Congress over period of 80 years did not modify Treasury decision of 1898 regarding enforcement of countervailing-duty law).

In the absence of any such extended, meaningful interaction between the executive and legislative branches which could support judicial reliance on the appearance of congressional acquiescence, the critical, unrefuted facts on this issue in this case remain plaintiff Steiner's estimate that 124,000 sea turtles continue to drown annually due to shrimping by countries other than the United States, that Congress (and the President) agreed on enactment of section 609 in an attempt to diminish the carnage, and that the Supreme Court continues to adhere to the view that the plain intent of this kind of legislation is to halt and reverse the trend toward species extinction, whatever the cost,

**31.** Affidavit of Nicole Walthall in Support of Plaintiffs' Motion for Summary Judgment (March 8, 1995), Exhibit M, p. 4.

**32.** *Cf. Sea Turtle Conservation and the Shrimp Industry; Hearing on the Effectiveness of Federal Efforts to Protect Endangered Species of Sea Turtles and the Impact of Turtle Excluder Devices (TEDS) on the Shrimp Fishing Industry Before the Subcommittee on Fisheries and Wildlife Conservation and the Environment of the House of Repre-* *sentatives Committee on Merchant Marine and Fisheries,* 101st Cong., 2d Sess. 35 (May 1, 1990).

**33.** Paragraphs 4 through 10 of the declaration filed by the Acting Assistant Secretary of State for Oceans and International Environmental and Scientific Affairs after the hearing on the cross-motions for summary judgment explain the process by which 14 countries of the region came to be considered covered.

and to give endangered species priority over the primary missions of federal agencies.

### D

Of course, the primary mission of the Department of State is to assist and support the President in the development and the maintenance of friendly relations with foreign sovereigns. This responsibility may be the most important, and the most delicate, which is why the authority of Congress is limited [34] and exercises of its power such as the APA also limit judicial review. Furthermore, independent of foreign affairs, courts afford administrative agencies deference in matters Congress commits to their areas of responsibility and expertise.

As just indicated in preceding part III C of this opinion, however, it is "emphatically the province and duty of the judicial department to say what the law is", *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), and this court concludes that the purview of section 609 is clear on its face and not susceptible to differing interpretations; it is devoid of words or terms of geographical limitation.

With regard to its enforcement globally, subsections 609(b)(2)(A) and (b)(2)(B) refer respectively to foreign adoption of regulatory program[s] governing the incidental taking of sea turtles "comparable to that of the United States" and to an average rate of foreign incidental taking "comparable to the average rate" of such taking by U.S. vessels. Obviously, this requirement of comparability is subject to differing points of view, which the parties to this case reflect. As quoted above,

the government's 1993 guidelines report that all U.S. commercial shrimp trawl vessels in the waters of the Gulf of Mexico and the Atlantic Ocean from North Carolina to Texas must use TEDs at all times in all areas. The guidelines thereupon state that, to

> receive a certification in 1994 and in subsequent years, affected nations must require the use of TEDs on all of their shrimp trawl vessels.

58 Fed.Reg. at 9,017. Further:

> For 1994 and subsequent years, take rates will be deemed comparable if the affected nations require that all shrimp trawl vessels use TEDs at all times, subject to the exemptions provided in section I(A)(3), above.[35]

And, those countries deemed covered to date by this law by the State Department have been certified as in compliance if all their trawlers were required to use TEDs and as having comparable take rates if those TEDs were required to be used at all times. *See* Defendants' Memorandum, Exhibits 4 and 5.

The plaintiffs respond that defendants'

> "interpretation" has rendered *all* of subsection (B) inoperative and meaningless. In so doing, defendants have defeated the plain intent of Congress that the importing nations invoke *both* a comparable regulatory program, per subsection (A), *and* attain a comparable incidental take rate, per subsection (B). To apply the law otherwise flies in the face the [*sic*] most basic tenets of statutory construction.[36]

---

**34.** *See, e.g., United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

**35.** 58 Fed.Reg. at 9,017. The exemptions referred to are:

(3) ... [T]he affected countries may allow exemptions to the required use of TEDs in the following cases:

(a) Any vessel whose nets are retrieved exclusively by manual rather than mechanical means. This exemption is not available to any vessel on which any mechanical device is used to haul aboard any part of the net.

(b) Any vessels which use exclusively the following specific gear; Barred-beam trawls or roller trawls, pusher-head trawls, wing nets, bait shrimpers and skimmer trawls. The defi-

nition of each of the above gear types is the same as that specified in U.S. domestic regulations.

(c) Until December 1, 1994, any vessel operating in inshore waters (bays and estuaries) and pulling a single net with a headrope length of less than 35 feet (10.7m) and a footrope length of less than 44 feet (13.4) may, as an alternative to using a TED, limit tow times to no more than 75 minutes. After December 1, 1994, affected nations must require the use of TEDs on all such vessels.

**36.** Plaintiffs' Reply and Opposition Memorandum, p. 21 (emphasis in original; footnotes omitted).

The tenets to which they refer are that a statute should be interpreted so as not to render one part either inoperative or superfluous, citing *United States v. Nordic Village, Inc.*, 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985); *Ishida v. United States*, 59 F.3d 1224 (Fed.Cir.1995); *Union Pacific Corp. v. United States*, 5 F.3d 523 (Fed.Cir.1993).

If this is the result of defendants' approach, the plaintiffs have not provided evidence to support it, notwithstanding the presence of Earth Island Institute's Sea Turtle Restoration Project in the area of current enforcement. On the contrary, what they have produced, for example, is the NMFS document quoted above to the effect that foreign nations requiring TEDs can expect to reduce turtle catch and mortalities by 97 percent[37] and the affidavit of GFA's president that, based upon his experience, he believes the use of TEDs is a reasonable and sensible means of protecting endangered sea turtles without unduly burdening the shrimping industry.[38] Indeed, while the domestic data presented with respect to TED efficacy are impressive, not all U.S. trawlers are subjected to actual scrutiny, only those found within the shipping channel of Cape Canaveral on the Atlantic coast of Florida or along the Gulf-of-Mexico coast of that state near Panama City. *Compare* 52 Fed.Reg. at 24,262 *with Turtle Excluder Devices; Adoption of Alternative Scientific Testing Protocol for Evaluation*, 55 Fed.Reg. 41,092 (Oct. 9, 1990).

■ In short, the court concludes that section 609(b)(2) is subject to varying interpretations regarding comparability but also that the record developed does not support the complaint that defendants' approach thereto is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2).

37. *Supra* note 18.

38. *Supra* note 3.

### E

■ An ancillary argument, pressed by the intervenor, is that

there are very serious questions relating to the consistency of [section 609] with U.S. GATT obligations. Indeed, in two instances GATT dispute panels have found analogous embargo provisions of the Marine Mammal Protection Act of 1972, 16 U.S.C. § 1361, *et seq.* . . ., to be violative of GATT principles. A GATT challenge to operation of [section 609] would likely produce the same conclusions.

Memorandum of Defendant–Intervenor, p. 44. Counsel candidly continue, however:

Obviously, this Court, in construing [section 609] cannot eliminate all infirmities under GATT. No matter what, as the Federal Defendants concede, [section 609] applies to the wider Caribbean/western Atlantic region, and such application could surely be subject to GATT challenge. Nonetheless, NFI suggests that a corollary of *The Charming Betsy* principle must be that, even if *all* conflict with international obligations cannot be eliminated, still it is appropriate to seek to minimize or reduce conflict to the maximum extent possible. In this case, that means construing [s]ection 609 so that it affects the fewest nations and products possible, consistent with its basic statutory purposes.

*Id.* at 45 (emphasis in original), referring to *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804).

Suffice it to state that this court concurs,[39] but also notes in passing that the record of enforcement of section 609 to date does not reveal troubling tensions with the foreign sovereigns already deemed covered, including those not certified positively and thus subject to embargoes.

### IV

To summarize the foregoing findings of fact and conclusions of law, the plaintiffs with the exception of GFA are entitled to grant of

39. *See generally Footwear Distributors and Retailers of America v. United States,* 18 CIT ——, 852 F.Supp. 1078 (1994).

that part of their motion for summary judgment which seeks a judicial declaration that the defendants are not properly enforcing the above-quoted section 609(b) by restricting its mandate to the Gulf of Mexico—Caribbean Sea—western Atlantic Ocean. It hereby is so declared.

Ergo, the defendants are hereby directed to prohibit not later than May 1, 1996 the importation of shrimp or products of shrimp wherever harvested in the wild with commercial fishing technology which may affect adversely those species of sea turtles the conservation of which is the subject of regulations promulgated by the Secretary of Commerce on June 29, 1987, 52 Fed.Reg. 24,244, except as provided in Pub.L. No. 101-162 § 609(b)(2), 16 U.S.C. § 1537 note, and to report the results thereof to the court on or before May 31, 1996, at which time entry of final judgment will be taken under advisement.[40]

So ordered.

**40.** In view of the nature of this interim relief, that part of the government's motion for summary judgment which seeks dismissal of Ronald Brown and Rolland A. Schmitten as parties defendant must be, and it hereby is, denied at this time since the court is not persuaded that they are or would be unnecessary to satisfaction of this writ.