Slip Op. 99 - 32

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - - - -x
EARTH ISLAND INSTITUTE, A CALIFORNIA    :
NONPROFIT CORPORATION; TODD STEINER;
THE AMERICAN SOCIETY FOR THE PREVENTION :
OF CRUELTY TO ANIMALS, A NEW YORK NON-
PROFIT CORPORATION; THE HUMANE SOCIETY  :
OF THE UNITED STATES, A DELAWARE NON-
PROFIT CORPORATION; and THE SIERRA CLUB, :
A CALIFORNIA NONPROFIT CORPORATION,

                                        :

                    Plaintiffs,

                                        :
            v.                            Court No. 98-09-02818
                                        :
WILLIAM M. DALEY, SECRETARY OF COMMERCE;
MADELEINE ALBRIGHT, SECRETARY OF STATE; :
ROBERT E. RUBIN, SECRETARY OF TREASURY;
MELINDA KIMBLE, ACTING ASSISTANT SECRE- :
TARY OF STATE FOR THE BUREAU OF OCEANS
AND INTERNATIONAL ENVIRONMENTAL AND SCI- :
ENTIFIC AFFAIRS; ROLLAND A. SCHMITTEN,
ASSISTANT ADMINISTRATOR FOR FISHERIES,  :
NATIONAL MARINE FISHERIES SERVICE; and
STUART E. EIZENSTAT, UNDER SECRETARY OF :
STATE FOR ECONOMIC, BUSINESS AND AGRI-
CULTURAL AFFAIRS,                        :

                    Defendants,         :

               -and-                    :

NATIONAL FISHERIES INSTITUTE, INC.,     :

               Intervenor-Defendant.    :
- - - - - - - - - - - - - - - - - - - - - -x

                 Memorandum & Order

[Plaintiffs' motion to declare defendants in
 violation of embargo enacted by Congress
 granted, in part.]

                            Dated:  April 2, 1999

     Legal Strategies Group (Joshua R. Floum and Louisa M. Dani-
els) for the plaintiffs.

     David W. Ogden, Acting Assistant Attorney General, and Lois
J. Schiffer, Assistant Attorney General; David M. Cohen, Direc-
tor, Commercial Litigation Branch, Civil Division (Lucius B. Lau)

and Environment and Natural Resources Division, Wildlife and Marine Resources Section (Eileen Sobeck and Jane P. Davenport), U.S. Department of Justice; and Jay S. Johnson, Deputy General Counsel, National Oceanic and Atmospheric Administration, U.S. Department of Commerce; and Office of the Legal Advisor, U.S. Department of State (Violanda Botet), of counsel, for the defendants.[1]

Garvey, Schubert & Barer (Eldon V.C. Greenberg) for the intervenor-defendant.

AQUILINO, Judge:  This case follows in the wake of legislation begun more than ten years ago in the Congress of the United States, followed by litigation in the U.S. District Court for the Northern District of California, continued in its Court of Appeals for the Ninth Circuit and then this Court of International Trade, followed by an appeal to the U.S. Court of Appeals for the Federal Circuit by the government and also by other nations' appeals to the World Trade Organization against the government.  The complaint raises an issue first raised by the plaintiffs in case no. 94-06-00321 and resolved by this court sub nom. Earth Island Institute v. Christopher, 20 CIT ___, 942 F.Supp. 597 (1996), which decision[2] was vacated by the Federal Circuit some two years later on procedural grounds viz. Earth Island Institute v. Albright[3].

_____

[1] The official caption above reflects modification of names and offices pursuant to formal motion by these counsel and also by the court to conform to the administrative record ("AR") filed by them herein.

[2] That opinion and order will be referred to hereinafter as slip op. 96-165.

[3] 147 F.3d 1352 (Fed.Cir. 1998).  The court of appeals also remanded to this court the issue of whether an award of attor-

(footnote continued)

I

The enactment of Congress which is at the core of this case and continuing controversy is found within the 1989 appropriations act for the Departments of Commerce and State, among others, Pub. L. No. 101-162, 103 Stat. 988, to wit:

>        Sec. 609. (a) The Secretary of State, in consultation with the Secretary of Commerce, shall, with respect to those species of sea turtles the conservation of which is the subject of regulations promulgated by the Secretary of Commerce on June 29, 1987--
>
>        (1) initiate negotiations as soon as possible for the development of bilateral or multilateral agreements with other nations for the protection and conservation of such species of sea turtles;
>
>        (2) initiate negotiations as soon as possible with all foreign governments which are engaged in, or which have persons or companies engaged in, commercial fishing operations which, as determined by the Secretary of Commerce, may affect adversely such species of sea turtles, for the purpose of entering into bilateral and multilateral treaties with such countries to protect such species of sea turtles;
>
>        (3) encourage such other agreements to promote the purposes of this section with other nations for the protection of specific ocean and land regions which are of special significance to the health and stability of such species of sea turtles;
>
>        (4) initiate the amendment of any existing international treaty for the protection and conservation of such species of sea turtles to which the United States is a party in order to make such treaty consistent with the purposes and policies of this section; and

---

neys' fees and expenses to the plaintiffs pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412, would be appropriate. That issue has been resolved per Earth Island Institute v. Albright, 22 CIT ___, Slip Op. 98-151 (Nov. 4, 1998).

(5) provide to the Congress by not later than one year after the date of enactment of this section--

(A) a list of each nation which conducts commercial shrimp fishing operations within the geographic range of distribution of such sea turtles;

(B) a list of each nation which conducts commercial shrimp fishing operations which may affect adversely such species of sea turtles; and

(C) a full report on--

(i) the results of his efforts under this section; and

(ii) the status of measures taken by each nation listed pursuant to paragraph (A) or (B) to protect and conserve such sea turtles.

(b)(1) IN GENERAL.-- The importation of shrimp or products from shrimp which have been harvested with commercial fishing technology which may affect adversely such species of sea turtles shall be prohibited not later than May 1, 1991, except as provided in paragraph (2).

(2) CERTIFICATION PROCEDURE.-- The ban on importation of shrimp or products from shrimp pursuant to paragraph (1) shall not apply if the President shall determine and certify to the Congress not later than May 1, 1991, and annually thereafter that--

(A) the government of the harvesting nation has provided documentary evidence of the adoption of a regulatory program governing the incidental taking of such sea turtles in the course of such harvesting that is comparable to that of the United States; and

(B) the average rate of that incidental taking by the vessels of the harvesting nation is comparable to the average rate of incidental taking of sea turtles by United States vessels in the course of such harvesting; or

> (C) the particular fishing environment
> of the harvesting nation does not pose a
> threat of the incidental taking of such sea
> turtles in the course of such harvesting.[4]

When the government decided to enforce this statute only within the "Wider Caribbean/Western Atlantic region", Earth Island Institute et al. brought their original action, complaining, among other things, that, on its face, the statute required worldwide application.  This court ultimately concurred, Earth Island Institute v. Christopher, 19 CIT 1461, 913 F.Supp. 559 (1995).  The government was afforded a period of five months to begin to prohibit

> the importation of shrimp or products of shrimp wher-
> ever harvested in the wild with commercial fishing
> technology which may affect adversely those species
> of sea turtles the conservation of which is the sub-
> ject of regulations promulgated by the Secretary of
> Commerce on June 29, 1987, 52 Fed.Reg. 24,244, except
> as provided in Pub. L. No. 101-162 §609(b)(2), 16
> U.S.C. §1537 note, and to report the results thereof
> to the court.

19 CIT at 1485-86, 913 F.Supp. at 580.  The government respond-ed with a motion for an additional one-year extension of time to comply.  The motion was denied, and a final judgment to the foregoing effect was entered.  See Earth Island Institute v. Christopher, 20 CIT ___, 922 F.Supp. 616, appeals dismissed, 86 F.3d 1178 (Fed.Cir. 1996).

---

[4] 103 Stat. at 1037-38, 16 U.S.C. §1537 note.  This statute will be referred to hereinafter as section 609.

A

Soon thereafter, the State Department published <u>Revis-ed Notice of Guidelines for Determining Comparability of Foreign Programs for the Protection of Turtles in Shrimp Trawl Fishing Operations</u>[5] and <u>Bureau of Oceans and International Environmental and Scientific Affairs; Certifications Pursuant to Section 609 of Public Law 101-162</u>, 61 Fed.Reg. 24,998 (May 17, 1996).  The April 19 notice announced that the

> Department of State has determined that import prohibi-tions imposed pursuant to Section 609 do not apply to shrimp or products of shrimp harvested . . . by com-mercial shrimp trawl vessels using TEDs comparable in effectiveness to those required in the United States.

> *     *     *

> <u>Shrimp Exporter's Declaration</u>.  The Department of State has determined that, in order to achieve effect-ive implementation of Section 609 on a world-wide basis, beginning May 1, 1996, all shipments of shrimp and pro-ducts of shrimp into the United States must be accompan-ied by a declaration (DSP-121, revised) attesting that the shrimp accompanying the declaration was harvested either under conditions that do not adversely affect sea turtles . . . or in waters subject to the jurisdiction of a nation currently certified pursuant to Section 609. All declaration[s] must be signed by the exporter of the shrimp.  A government official of the harvesting nation must also sign those declarations asserting that the ac-companying shrimp was harvested under conditions that do not adversely affect sea turtles.  The declaration must accompany the shipment through all states of the export process, including in the course of any transshipments and of any transformation of the original product.[6]

_____

[5] 61 Fed.Reg. 17,342 (April 19, 1996) [hereinafter referred to as "1996 Revised Guidelines"].

[6] 61 Fed.Reg. at 17,343.  The acronym "TEDs" refers to var-ious turtle excluder devices.  <u>See</u> <u>generally</u> <u>Earth Island Insti-</u>

(footnote continued)

Earth Island Institute <u>et al</u>. challenged this approach as "dangerous" and "disingenuous" because it

> eliminates any incentive for countries to put TEDs on more than a handful of nets.  Countries can evade the Law's embargo by exporting to the United States those shrimp caught by a few designated vessels which are equipped with TEDs, while exporting elsewhere shrimp caught by those which are not.  This eviscerates <u>both</u> of Congress' purposes in enacting the Turtle Law.  It fails to create the level playing field which Congress undeniably sought for the U.S. fleet, which is required to put TEDs on <u>each and every</u> vessel.  It also guts the Law's objective of protecting these endangered species -- for substantial portions of the shrimping fleets of exporting nations may now eschew TEDs with impunity.

20 CIT at \_\_\_, 942 F.Supp. at 600-01.  In other words, the plaintiffs contended that the State Department's regulations were not in conformity with the court's judgment, whereupon they moved the court to compel the government to "embargo <u>all</u> wild-caught shrimp exports from countries which do not adopt a regulatory scheme requiring TEDs that is comparable to that of the United States." 20 CIT at \_\_\_, 942 F.Supp. at 601.

The court concurred -- in slip op. 96-165, familiarity with which is presumed.  Noting that the "constitutional, legislated will of Congress remains unambiguous upon reading and rereading its manifestation in section 609"[7], that the statute is "succinct and should be read in toto"[8], and that the domestic, U.S. comparator was an underpinning of the judgment which had not

---

tute v. Christopher, 19 CIT 1461, 1463 n. 1, 913 F.Supp. 559, 563 n. 1 (1995), and references cited therein.

[7] 20 CIT at \_\_\_, 942 F.Supp. at 603.

[8] <u>Id</u>.

been modified by the government[9], the court reiterated that the record still

> supports a finding that the requirement of TEDs on all vessels of a harvesting nation at all times results in a satisfactory rate of incidental taking of endangered species of sea turtles.  In the absence of intelligence to the contrary, it remains a fortiori that requiring anything less than is comparable to the U.S. program violates section 609 and the court's judgment.

20 CIT at ___, 942 F.Supp. at 605.

The government and the intervenor-defendant National Fisheries Institute, Inc. ("NFI") appealed the court's resultant order of enforcement to the Federal Circuit, which, as indicated above, ultimately vacated it on the ground that Earth Island Institute et al. withdrew beforehand the motion which had caused consideration of entry of such necessary, additional, equitable relief and thereby deprived this court of any jurisdiction.[10] But see 28 U.S.C. §1585 ("The Court of International Trade shall possess all the powers in law and equity of, or as conferred by statute upon, a district court of the United States"); United States v. Hanover Insurance Co., 82 F.3d 1052, 1054 (Fed.Cir.

---

[9] 20 CIT at ___, 942 F.Supp. at 605.

[10] Earth Island Institute v. Albright, 147 F.3d 1352, 1356 (Fed.Cir. 1998).  That court's vacatur for lack of jurisdiction also was held to apply to Earth Island Institute v. Christopher, 20 CIT ___, 948 F.Supp. 1062 (1996), which decision had been engendered by the appellants' motions for stays of the order of enforcement, pending their appeals therefrom, and which had been granted in part by this court.  But see CIT Rule and Federal Rule of Civil Procedure 62 (Stay of Proceedings to Enforce a Judgment) and Federal Circuit Rule of Practice and Federal Rule of Appellate Procedure 8 (Stay of Injunction Pending Appeal) and cases decided thereunder.

1996) ("the Court of International Trade has the inherent power to determine the effect of its judgments and issue injunctions to protect against attempts to attack or evade those judgments"). See also Bronson v. Shulten, 104 U.S. (14 Otto) 410, 415 (1881) ("It is a general rule of the law, that all the judgments, decrees, or other orders of the courts, however conclusive in their character, are under the control of the court which pronounces them during the term at which they are rendered or entered of record, and they may then be set aside, vacated, modified, or annulled by that court"); Wyler v. Union Pacific Ry. Co., 89 F. 41, 42 (C.C. W.D.Mo. 1898) ("during the term all the proceedings are in the breast of the judge, and they may be altered or vacated as justice requires"); Union Trust Co. v. Rockford, R.I. & St.L. R. Co., 24 F.Cas. 704, 705 (C.C. N.D.Ill. 1874)(No. 14,401) ("the power of a court over its judgments, to set aside, modify or annul, is unlimited during the entire term at which such judgments are rendered"); Sam v. State, 265 P. 622, 623 (Ariz. 1928); Banegas v. Brackett, 34 P. 344, 344-45 (Cal. 1893); Bradford v. People, 43 P. 1013, 1015 (Colo. 1896); Whitaker v. Wright, 129 So. 889, 891-92 (Fla. 1930); Tyler v. Eubanks, 60 S.E.2d 130, 133 (Ga. 1950); Durre v. Brown, 34 N.E. 577, 578 (Ind.App. 1893); Hallam v. Finch, 195 N.W. 352, 353 (Iowa 1923); Sylvester v. Riebolt, 164 P. 176, 177 (Kan. 1917); Fields v. Combs, 18 S.W.2d 965, 966 (Ky. 1929); Barber v. Barber 98 A. 822, 823 (Me. 1916); Harvey v. Slacum, 29 A.2d 276, 277 (Md. 1942); Morse v. Morse,

154 P.2d 982, 984 (Mont. 1945); <u>Bradley v. Slater</u>, 75 N.W. 826, 826 (Neb. 1898); <u>Henderson v. Dreyfus</u>, 191 P. 455, 457 (N.M. 1920); <u>Cook v. Western Union Tel. Co</u>., 64 S.E. 204, 205 (N.C. 1909); <u>Maryland Cas. Co. v. John F. Rees Co</u>., 40 N.E.2d 200, 202 (Ohio 1941); <u>Tillman v. Tillman</u>, 184 P.2d 784, 785 (Okla. 1947); <u>Bergman v. West</u>, 262 S.W.2d 435, 436 (Tex.Civ.App. 1953).

                                     B

        Notwithstanding such well-established precedent, the government appellants argued to the Federal Circuit that this court "lacked any jurisdiction to rule"[11] and "exceeded any authority it might have had to enforce its own order".  Brief for Madeleine K. Albright <u>et al</u>., p. 20 (Fed.Cir. Nos. 97-1085,-1086 Feb. 11, 1997).  At the same time as those appellants were also arguing in Washington that this court "erred in its interpretation of the scope of section 609"[12], the government was on another tack before the consolidated panel established in Geneva by the Dispute Resolution Body of the World Trade Organization ("WTO") at the instance of Malaysia and Thailand, and Pakistan, and finally India, <u>sub</u> <u>nom</u>. <u>United States -- Import Prohibition of Certain Shrimp and Shrimp Products</u>, WT/DSB/M/31 (12 May 1997).

---

        [11] Brief for Madeleine K. Albright <u>et al</u>., p. 17 (Fed.Cir. Nos. 97-1085,-1086  Feb. 11, 1997).  <u>See</u> <u>also</u> Corrected Reply Brief for Madeleine K. Albright <u>et al</u>., pp. 12-19 (Fed.Cir. Nos. 97-1085,-1086  June 1997).

        [12] Brief for Madeleine K. Albright <u>et al</u>., p. 25 <u>et seq</u>. (Fed.Cir. Nos. 97-1085,-1086  Feb. 11, 1997).

For example, the First Submission of The United States repre-
sented:

   **"A.    Sea Turtles are a shared global resource**

. . . 4.   There has never been a clearer or more compelling case
presented to the WTO for the conservation of an exhaustible nat-
ural resource or the protection of animal life or health than
this dispute.  For more than 20 years, there has been an inter-
national consensus . . . that sea turtles are endangered.  The
international community . . . has agreed that sea turtles need
to be protected and conserved.  Scientific research demonstrates
that the accidental capture and drowning of sea turtles in shrimp
trawl nets represents the single largest human-related cause of
sea turtle deaths and has contributed greatly to the drastic de-
mise of these species.  Finally, the international community has
recognized that the drowning of sea turtles in shrimp trawl nets
can be virtually eliminated through the use of a simple, inex-
pensive device -- the . . . 'TED'.  The required use of TEDs has
become a multilateral environmental standard.

5.   The United States requires its shrimp fishermen to harvest
shrimp in a manner that is safe for sea turtles.  In this case,
the United States only asks that shrimp imported into the United
States should be harvested in a comparable manner.  In this way,
the U.S. market will not cause a further depletion of endangered
sea turtle species.  In this way, the United States is not forced
to be an unwilling partner in the extinction of sea turtles.

6.  Moreover, the U.S. measures at issue in this case appear to be effective in protecting and conserving sea turtles while not disrupting trade.  U.S. imports of shrimp have remained steady, and suppliers have had little difficulty adjusting their practices so as to ensure that exports of shrimp to the United States have been harvested in a manner that does not harm sea turtles.

                        *      *      *

### B.  Sea turtles are endangered

16.  . . . Today, all species of sea turtles face the danger of extinction, primarily because of human activities.  . . .

17.  The international community has responded to the imperiled global status of sea turtles.  Since 1975, all species of sea turtles have appeared on Appendix I to the Convention on International Trade in Endangered Species of Wild Flora and Fauna ("CITES"), which includes 'all species threatened with extinction which are or may be affected by trade.'  Similarly, all species except the flatback are listed in Appendices I and II to the Convention on the Conservation of Migratory Species of Wild Animals and in Appendix II of the Protocol Concerning Specially Protected Areas and Wildlife to the Convention for the Protection and Development of the Marine Environment of the Wider Carribean Region.

18.  Since the 1970s, all species of sea turtles that occur in waters subject to U.S. jurisdiction have been listed as either

endangered or threatened under the U.S. Endangered Species Act of 1973 ("ESA").

### C. Shrimp trawl nets are the largest human-induced cause of sea turtle mortality

19. Sea turtles face a variety of threats in both the marine and nesting environments. *However, the incidental capture and drowning of sea turtles in shrimp trawl nets has caused the greatest number of human-induced sea turtle deaths, accounting for more deaths than all other human activities combined.* For this reason, the Marine Turtle Specialist Group of the IUCN (World Conservation Union) identified reduction of sea turtle mortality in such trawling operations as a priority action item.

20. As early as 1982, it was recognized that 'shrimp trawlers are considered to capture and drown more sea turtles worldwide than any other form of incidental capture.' . . .

*       *       *

### D. Turtle excluder devices (TEDs) effectively prevent the drowning of sea turtles in shrimp trawl nets

22. The turtle excluder device . . . is a simple, cheap and highly effective solution to the problem of sea turtle mortality in shrimp trawl nets. . . . TEDs . . . have been developed and manufactured on a commercial basis in a wide variety of nations.

23. The United States Government conducted a detailed, comprehensive study, involving thousands of hours spent by neutral

observers aboard shrimp trawl vessels.  Based on this study and
its own exhaustive analysis, the U.S. National Academy of Sci-
ences concluded in 1990 that properly installed TEDs -- of the
sort required for use in the United States for more than seven
years -- are a practical and cost-effective way to minimize the
unintentional drowning of sea turtles in shrimp trawl nets.
*Properly installed TEDs approach 97 percent efficiency in allow-
ing sea turtles to escape from shrimp trawl nets, while limiting
shrimp loss rates to 1-3 percent.*  . . .

24.  TEDs are now widely used in shrimp trawl fisheries though-
out the Western Hemisphere.  More recently, African and Asian
countries have begun requiring their use as well.  . . .

> **E.  The use of TEDs has become a multilateral
>     environmental standard**

25.  The use of TEDs has become a recognized multilateral envi-
ronmental standard, fulfilling twin commitments on the part of
the international community to conserve endangered species such
as sea turtles and to minimize their unintentional mortality in
fishing operations.

26.  The international community has long recognized the need to
protect endangered species such as sea turtles.  There are now
134 nations that are parties to CITES.  . . .

27.  The international community has also long been aware of the
threat to sea turtles and to other living resources as a result

of their incidental mortality in marine fishing operations.  The 1982 United Nations Convention on the Law of the Sea . . . generally requires States, both within areas under their national jurisdiction and on the high seas, to ensure through proper conservation and management measures that the maintenance of living resources is not endangered by over-exploitation.  . . .

\*     \*     \*

31.  The countries in the Western Hemisphere understood that, because of the highly migratory nature of sea turtles, a treaty that afforded protection to sea turtles in only one region of the world would not succeed unless countries in other regions adopted comparable measures.  For this reason, Article XX of the Inter-American Convention [for the Protection and Conservation of Sea Turtles[13]] encourages its parties to negotiate complementary protocols to that treaty with States in other regions in order to promote the protection and conservation of sea turtles outside the Western Hemisphere.

\*     \*     \*

33.  . . .[T]he required use of TEDs, both in Asia and throughout the Western Hemisphere, has become a multilateral environmental standard.  Today, at least the following nations require TEDs on shrimp trawl vessels subject to their jurisdiction: Belize, Brazil, Colombia, Costa Rica, Ecuador, El Salvador, Guatemala, Guyana, Honduras, Indonesia, Mexico, Nicaragua, Nigeria,

---

[13] 37 I.L.M. 1246.

Panama, the People's Republic of China, Thailand, Trinidad and Tobago, the United States and Venezuela.  Other nations in Asia and Africa have informed the United States of their intention or desire to establish TEDs programs.

34.  One reason why TEDs use has become so widespread is that the United States Government has undertaken extraordinary efforts to transfer TEDs technology to governments and industries in other countries, particularly in developing countries.  . . .

35.  Through . . . workshops and related efforts, the United States has transferred TEDs technology to at least the following countries:  Australia, Belize, Brazil, Brunei, Colombia, Costa Rica, Ecuador, El Salvador, Eritrea, Guatemala, Guyana, Honduras, India, Indonesia, Japan, Kenya, Mexico, Madagascar, Malaysia, Mozambique, Nicaragua, Panama, the People's Republic of China, the Philippines, Singapore, Suriname, Tanzania, Thailand, Trinidad and Tobago, and Venezuela.  . . .

36.  Recently, the United States intensified its TEDs technology transfer efforts.  In 1996 alone, the United States conducted TEDs training workshops in Mombasa, Kenya; in Songkla, Thailand; in Tegal, Indonesia; in Guayaquil, Ecuador; and in Orissa, India. The workshop in Thailand . . . includ[ed] . . . fisheries managers and shrimp fishermen from Australia, Brunei, Japan, Malaysia, the Philippines, Singapore and Thailand.  In 1997, . . . the United States . . . held TEDs workshops in Mombasa, Kenya

. . .; in several locations in Australia; in Cochin, India; and in Chittagong, Bangladesh.

37.   . . . TEDs have become a true environmental success story. . . . Their use is now a multilateral environmental standard.

**F.   TEDs are required in the United States to minimize sea turtle mortalities caused by shrimp trawling**

38.   The United States Government requires shrimp trawl vessels that operate in waters subject to U.S. jurisdiction in which there is a likelihood of intercepting sea turtles to use TEDs at all times.

39.   . . . [A]ll species of sea turtles occurring in waters subject to U.S. jurisdiction are listed as endangered or threatened under the ESA.  Under the authority of the ESA, NMFS[14] first required the use of TEDs by shrimp trawl vessels operating in U.S. waters on the basis of regulations promulgated in 1987, which went into full effect in 1990.  The 1987 regulations required that all vessels 25 feet or longer must use TEDs when trawling for shrimp in offshore waters where there is a likelihood of intercepting sea turtles and that shrimp vessels less than 25 feet trawling in such offshore waters must use TEDs or restrict their tow time to 90 minutes or less.  Tow times that short in duration are not likely to result in the drowning of captured sea turtles.  Similarly, all vessels trawling for shrimp

---

[14] National Marine Fisheries Service, National Oceanic and Atmospheric Administration, U.S. Department of Commerce.

in such inshore waters were required to use TEDs or to limit tow times to 90 minutes or less.  The regulations also set forth required specifications for TEDs, a primary requirement being a 97 percent exclusion rate of captured sea turtles.

40.  A 1990 U.S. National Academy of Sciences report on sea turtles . . . recommended tightening and extending the requirements for TEDs.  NMFS accordingly promulgated even stricter TEDs requirements in 1992, which were implemented in three phases (late 1992, January 1993 and December 1994).  Since December 1, 1994, these regulations have required the use of TEDs in all shrimp trawl nets, with very limited exceptions, and have eliminated the option for some small shrimp trawl vessels to restrict tow times in lieu of using TEDs.  . . .

### G.  Without the use of TEDs, other measures to protect sea turtles are insufficient

41.  . . . Any effective program to allow the recovery of these endangered species must include the required use of TEDs by shrimp trawl vessels that operate in areas and at times where there is a likelihood of intercepting sea turtles.

*       *       *

47.  . . . [E]ven if . . . other measures taken . . . to protect sea turtles were effectively enforced, without the required use of TEDs, they would be insufficient to allow sea turtle populations in that region of the world to recover.  These other con-

servation measures have not been shown to have any significant effect on the number of sea turtles that survive to adulthood and reproduce.

### H.   Section 609 promotes the protection and conservation of sea turtles

48.   Because sea turtles migrate widely and are a shared global resource, U.S. domestic measures to protect sea turtles would not be effective unless shrimp exported to the United States by other nations is harvested in a manner that does not harm sea turtles.

*      *      *

50.   Section 609 . . . ensures shrimp exported to the U.S. market is harvested in a manner that does not harm sea turtles. Section 609(b) prohibits the importation of shrimp or products from shrimp harvested with commercial fishing technology that may adversely affect species of sea turtles protected under U.S. laws and regulations . . ..

51.  Following the enactment of Section 609 in 1989, the U.S. Government stepped up its campaign . . . to transfer TEDs technology to other countries.  In addition, the U.S. Department of State developed a set of guidelines for determining the comparability of foreign programs for the protection of sea turtles in shrimp trawl fishing operations.  The Department . . . provided copies of them to all affected governments.  . . .

52.  Until recently, the U.S. Administration implemented Section 609 based on the interpretation that it applied only to nations in the Wider Caribbean/Western Atlantic region.  . . .  The initial Department of State Guidelines, published in 1991 and revised in 1993, set forth the criteria for certification of these countries.  The Department . . . established interim requirements for certification in the first years, designed to encourage the development of comprehensive TEDs programs in these countries.  As of May 1, 1994, certification depended on the implementation of such a comprehensive TEDs program.

53.  On December 29, 1995, the U.S. Court of International Trade issued an order . . . requiring that Section 609 be applied on a global basis as of May 1, 1996.  . . .

54.  Following the . . . order . . . , the Department of State issued the current Guidelines to reflect the requirement to apply Section 609 on a global basis.  . . .  They make clear that the United States Government requires commercial shrimp trawl vessels in the United States to use TEDs in areas and at times when there is a likelihood of intercepting sea turtles.

*     *     *

61.  For those shrimp harvesting nations . . . whose shrimp fishing environments *do* pose a threat to sea turtles, the Guidelines . . . set forth criteria upon which the Department of State bases its determinations for certification under Section 609.

The Department . . . certifies any such nation as having a program to protect sea turtles in the course of shrimp trawl fishing comparable to the U.S. program if the nation requires the use of TEDs in a manner comparable to the TEDs requirements in effect in the United States and if the nation has a credible enforcement effort that includes monitoring for compliance and appropriate sanctions.  Because TEDs, if used properly, allow at least 97 percent of captured sea turtles to escape from shrimp trawl nets, the Guidelines provide that any nation which adopts and enforces TEDs requirements comparable to those of the United States will also be deemed to have achieved a comparable 'incidental take rate' of sea turtles in its commercial shrimp trawl fisheries.

*     *     *

63.  In 1997, the Department of State . . . certified forty-two shrimp harvesting nations pursuant to Section 609.

64.  The Department of State has certified 24 nations as having shrimp fishing environments that do not pose a threat of incidental taking of sea turtles in the course of commercial shrimp trawl fishing.  Of those 24 nations, the Department determined that the following 16 nations have shrimp fisheries in only cold waters where there is essentially no risk of taking sea turtles: Argentina, Belgium, Canada, Chile, Denmark, Finland, Germany, Iceland, Ireland, the Netherlands, New Zealand, Norway, Russia, Sweden, the United Kingdom and Uruguay.  The Department certified

the following eight nations on grounds that their fishermen only harvest shrimp using manual rather than mechanical means to retrieve nets:  the Bahamas, Brunei, the Dominican Republic, Haiti, Jamaica, Oman, Peru and Sri Lanka.

65.  The Department of State has also certified the following nations . . . as having adopted programs to reduce the incidental capture of sea turtles in shrimp fisheries comparable to the U.S. program:  Belize, Brazil, Colombia, Costa Rica, Ecuador, El Salvador, Guatemala, Guyana, Honduras, Indonesia, Mexico, Nicaragua, Nigeria, Panama, the People's Republic of China, Thailand, Trinidad and Tobago, and Venezuela.

## I.  The U.S. measures have not disrupted trade

66.  The U.S. measures at issue in this dispute have not disrupted the importation of shrimp into the United States.  Those measures went into effect with respect to the Complainants and other shrimp harvesting nations outside the Wider Caribbean/ Western Atlantic region on May 1, 1996. Even though the measures were in effect throughout the last two thirds of 1996, . . . U.S. shrimp imports in 1996 were within 1 percent of the average annual level from 1993-1995.

67.  Furthermore, were the U.S. measures at issue in this dispute truly disruptive of trade, one would expect that a restriction in supply would result in a corresponding increase in the price of shrimp imports into the United States.  The opposite has occurr-

ed.  The average unit value of U.S. shrimp imports *declined* be-
tween 1995 and 1996, falling from $9.52 (U.S.) per kilogram to
$9.30 (U.S.) per kilogram."[15]

    This well-documented presentation was supplemented by
the government, in part, as follows:

> . . . Section 609 is "made effective in conjunction
> with restrictions on domestic production or consump-
> tion."  The Appellate Body interprets this criterion
> to mean that the measures concerned impose restrictions
> not just on the imported product but also with respect
> to the comparable domestic product.  The Appellate Body
> has also stated that this requirement is one of "even-
> handedness," and that there is no textual basis for
> *identical* treatment of domestic and imported products.

> 61.  These tests are met here.  The United States
> requires its shrimp trawl vessels that operate where
> there is a likelihood of intercepting sea turtles to
> use TEDs at all times.  Section 609 applies comparable
> standards to imported shrimp.  The statute allows any
> nation to be certified -- and thus to avoid any re-
> striction on shrimp exports to the United States -- if
> it meets criteria for sea turtle safety in the course
> of shrimp harvesting that are comparable to criteria
> applicable in the United States.  In particular, for
> those nations whose shrimp trawl vessels operate in
> areas where there is a likelihood of intercepting sea
> turtles, Section 609 allows for certification if such
> nations adopt TEDs requirements comparable to those
> in effect in the United States.[16]

---

[15] United States -- Import Prohibition on Certain Shrimp and
Shrimp Products First Submission of The United States, WT/DSB/M/
31, § III (June 9, 1997) (all emphasis in original; supporting
citations omitted).

[16] United States -- Import Prohibition of Certain Shrimp and
Shrimp Products Second Submission of The United States of Ameri-
ca, WT/DSB/M/31, paras. 60, 61 (July 28, 1997)(emphasis in orig-
inal; citing United States -- Standards for Reformulated and
Conventional Gasoline Report of the Appellate Body, WT/DS2/AB/R
(Jan. 29, 1996), and First Submission of The United States,
paras. 50-62).

Notwithstanding these unrefuted, and largely irrefut-
able, averments[17], the dispute-resolution panelists from Brazil,
Germany and Hong Kong did not accept the U.S. approach as com-
pletely consistent with the 1994 General Agreement on Tariffs
and Trade, concluding that it constituted

> clearly a threat to the multinational trading system
> . . . applied without any serious attempt to reach,
> beforehand, a negotiated solution.
>
> 7.502  We therefore find that the US measure at issue
> is not within the scope of measures permitted under
> the chapeau of Article XX.[18]

---

[17] See United States -- Import Prohibition of Certain Shrimp
and Shrimp Products Report of the Panel, WT/DS58/R (15 May 1998)
passim; Submission of The United States (Appellant) Before The
World Trade Organization Appellate Body, AB-1998-4, para. 5, p.
2 (23 July 1998)("The Panel in its findings does not take issue
with the factual assertions of the United States").

[18] United States -- Import Prohibition of Certain Shrimp and
Shrimp Products Report of the Panel, WT/DS58/R, paras. 7.501,
7.502 (15 May 1998).  Article XX provides, in pertinent part:

> Subject to the requirement that such measures are
> not applied in a manner which would constitute a means
> of arbitrary or unjustifiable discrimination between
> countries where the same conditions prevail, or a
> disguised restriction on international trade, nothing
> in this Agreement shall be construed to prevent the
> adoption or enforcement by any contracting party of
> measures:
>
> *   *   *
>
> (*b*) necessary to protect human, animal or plant
> life or health;
>
> *   *   *
>
> (*g*) relating to the conservation of exhaustible
> natural resources if such measures are made effective
> in conjunction with restrictions on domestic production
> or consumption; . . ..

(footnote continued)

Whereupon the United States formally appealed to the WTO's

Appellate Body on the ground that,

> [u]nder this improper reasoning, any measure falling
> under any one of the Article XX exceptions would none-
> theless be outside the scope of Article XX if a Panel,
> in its own subjective view, believed that the measure
> hypothetically could cause harm to some undefined,
> idealized "trading system."
>
> 7.  Not only is the Panel's adoption of this "threat
> to the multilateral trading system" test inconsistent
> with the text of the GATT 1994, . . . it also reflects
> a fundamental misinterpretation of the object and pur-
> pose of the World Trade Organization Agreement.  The
> WTO Agreement, which was the first multilateral trade
> agreement concluded after the United Nations (UN) Con-
> ference on Environment and Development, provides that
> the rules of trade must not only promote expansion
> of trade and production, but do so in a manner that
> respects the principle of sustainable development and
> protects and preserves the environment.  The Panel's
> "threat to the multilateral trading system" test would
> make trade concerns paramount to all other concerns,
> and is thus inconsistent with the object and purpose
> of the WTO Agreement.

Submission of The United States (Appellant) Before The World

Trade Organization Appellate Body, AB-1998-4, paras. 6, 7 (23

July 1998) (footnote omitted).  In doing so, it emphasized some

of the facts quoted above at length and originally presented to

the consolidated panel, including:

---

According to the Report of the Appellate Body in United States --
Standards for Reformulated and Conventional Gasoline, WT/DS2/
AB/R, p. 22, the proper application of this article involves
a two-tiered analysis:  First, the regulation at issue must be
"provisionally justified" by one of the enumerated exceptions --
paragraphs (a) to (j).  Second, the measure must satisfy the re-
quirements of the introductory clauses, the article's chapeau.
In other words, the measure, as applied, must not be either "ar-
bitrary or unjustifiable discrimination between countries where
the same conditions prevail", or "a disguised restriction on in-
ternational trade".

The United States Government requires shrimp trawl vessels that operate in waters subject to U.S. jurisdiction in which there is a likelihood of intercepting sea turtles to use TEDs at all times.  Because sea turtles migrate widely, U.S. domestic measures to protect sea turtles would not be effective unless other nations also act to protect them.  Accordingly, U.S. law (Section 609 of Public Law 101-162) calls for bilateral and multilateral efforts to protect sea turtles.

Id., para. 16 (footnotes omitted).[19]


                                    II

Prior to issuance of the WTO Appellate Body Report, but after the mandate of the Federal Circuit had come down, the State Department determined to publish Revised Notice of Guidelines for Determining Comparability of Foreign Programs for the Protection of Sea Turtles in Shrimp Trawl Fishing Operations[20], perhaps in the hope of influencing the deliberations of that body before

_____

[19] While the Appellate Body did conclude that the consolidated panel had erred in finding that the U.S. approach is not within the scope of measures permitted under the chapeau of Article XX of the GATT 1994, and also in finding that accepting non-requested information from non-governmental sources is incompatible under the WTO dispute-resolution process, it also concluded, for reasons referred to hereinafter, that the

United States measure, while qualifying for provisional justification under Article XX(g), fails to meet the requirements of the chapeau of Article XX, and, therefore, is not justified under Article XX of the GATT 1994.

United States -- Import Prohibition of Certain Shrimp and Shrimp Products Report of the Appellate Body, WT/DS58/AB/R, para. 187 (12 Oct. 1998)(referred to and cited hereinafter as "WTO Appellate Body Report").

[20] 63 Fed.Reg. 46,094 (Aug. 28, 1998) [referred to hereinafter as "1998 Revised Guidelines"].

rendering its decision.[21]  The notice advises of the Department's decision to "reaffirm", subject to "certain modifications"[22], its 1996 Revised Guidelines, the enforcement of which had been enjoined, in part, per this court's slip op. 96-165:

> The Department of State reinstates its determination that the harvesting of shrimp with TEDs does not adversely affect sea turtle species and that TED-caught shrimp is therefore not subject to the import prohibition created by Section 609(b)(1).  . . . [H]owever, the Department . . . has decided to establish several conditions and incentives relating to the importation of such shrimp that are intended to address concerns that have been raised about the effect of this determination on the conservation of sea turtle species.

63 Fed.Reg. at 46,095.  Those concerns are stated to be that foreign harvesters will fraudulently claim that shrimp have been harvested with TEDs, that foreign nations which have established regulatory programs comparable to the U.S. program will abandon or limit them so that only trawlers harvesting shrimp for export to the U.S. market will actually employ TEDs, and that other na-

---

[21] Compare, e.g., transcripts of telephone conference with counsel in this case on September 18, 1998, pp. 27-28 and of oral argument on December 14, 1998, pp. 59, 84, 101 and WTO Appellate Body Report, para. 5, p. 4 and n. 23 thereto, with AR Tab 6, first two pages (decision "done solely for domestic reasons"). Defendants' counsel have seen fit to repeat these words, first scribbled by defendant Eizenstat at the top of the State Department's "Action Memorandum", in their memorandum of law, pp. 7-8, 38 and at oral argument, Tr. p. 100, but without any hint as to what those reasons might have been.  See also Dep't of State, Notice of Proposed Revisions to Guidelines for the Implementation of Section 609 of Public Law 101-162 Relating to the Protection of Sea Turtles in Shrimp Trawl Fishing Operations, 64 Fed.Reg. 14,481, 14,482 (March 25, 1999) [hereinafter referred to as "March 1999 Notice of Revisions"]("For reasons unrelated to the WTO case, the Department . . . modified its implementing Guidelines on August 28, 1998").

[22] 63 Fed.Reg. at 46,095.

tions which may be considering the adoption of such a program may opt instead for equipping only those vessels trawling for shrimp for the American market. See id. Of course, as the Department indicates, only time might prove which of these materialize antithetically to the concerns of Congress in enacting section 609. For the moment, the world is apprised of the U.S. government's resurrected "decision to permit the importation of TED-caught shrimp from uncertified nations". Id. See March 1999 Notice of Revisions, 64 Fed.Reg. at 14,482.

A

This decision has brought forth the above-named plaintiffs, commencing this case via simultaneous filing of a summons and complaint and application for temporary restraining order and preliminary injunction. Among other relief[23], they request that the court declare that the resultant 1998 Revised Guidelines are in violation of the Administrative Procedure Act and section 609; enjoin the defendants

> from allowing the importation of shrimp and shrimp pro-
> ducts from any nation with commercial fishing operations
> which may adversely impact sea turtles unless and until
> the Secretary of State determines and certifies . . .
> that the foreign nation has a current and enforceable
> sea turtle protection program (including the require-
> ment that TEDs are used on all shrimp trawling vessels),
> and an incidental taking rate fully comparable to that
> of the United States at the present time[24;]

---

[23] See generally Plaintiffs' Complaint for Declaratory Judgment, Review of Agency Action, Mandamus and Injunctive Relief, § IX.

[24] Id., p. 11, para. 5 (emphasis in original).

and order the Secretary of State to make publicly available all evidence supportive of a determination that a particular nation has a comparable regulatory program and rate of incidental taking of sea turtles.

The court afforded all parties an opportunity to be heard on plaintiffs' application for immediate injunctive relief. A temporary restraining order was denied, whereupon the plaintiffs have interposed a motion for judgment upon the record filed herein by the defendants.

The court's jurisdiction over this kind of case has been established to be pursuant to 28 U.S.C. §1581(i). See Earth Island Institute v. Christopher, 6 F.3d 648 (9th Cir. 1993), and Earth Island Institute v. Christopher, 19 CIT 812, 890 F.Supp. 1085 (1995). And it "shall review the matter as provided in section 706 of title 5"[25], U.S.C., which part of the Administrative Procedure Act authorizes the court, among other things, to set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

(1)

As submitted, the record is represented to include all documents pertaining to the decision of Stuart E. Eizenstat, Under Secretary of State for Economic, Business and Agricultural Affairs, to revise the implementation of certain aspects of

---

[25] 28 U.S.C. §2640(e).

section 609, as reflected in the notice published by the Department[26], supra. It reveals that the decision was based upon the "Action Memorandum"[27] in the name of the Acting Assistant Secretary of State for Oceans and International Environmental and Scientific Affairs, defendant Kimble herein. In a subsequent letter to NFI, she explains the crux of the decision to be:

> . . . We remain of the view, as we argued before th[e] Court [of Appeals for the Federal Circuit], that shrimp caught in trawl nets equipped with . . . TEDs[] are not "harvested with commercial fishing technology that may adversely affect" species of sea turtles. Such shrimp is thus not subject to the import prohibition that Congress established in Section 609.

AR Tab 11, p. 3. See also AR Tab 6, p. 3. According to the record, it was arrived at over the stated concerns and objections of a number of organizations committed to, if not expert in, the protection and preservation of endangered species[28], including the government's own NMFS, which is the organization within the Department of Commerce most directly involved in

---

[26] Declaration of David A. Balton, Director of the Office of Marine Conservation, Bureau of Oceans and International Environmental and Scientific Affairs, U.S. Department of State, para. 2.

[27] See AR Tab 6.

[28] For example, the letter at AR Tab 1 to Secretary of State Albright and U.S. Trade Representative Barshefsky was signed by the heads of the Center for International Environmental Law, Center for Marine Conservation, Community Nutrition Institute, Defenders of Wildlife, Earth Island Institute, Earthjustice Legal Defense Fund, Environmental Defense Fund, Friends of the Earth, Greenpeace, Humane Society of the United States, National Wildlife Federation, Natural Resources Defense Council, and the Sierra Club.

compliance with the mandate of Congress in section 609.  The

objections of the Assistant Administrator for Fisheries,

defendant Schmitten herein, were articulated, in part, as

follows:

> . . . NMFS does not believe that DOS should return to
> permitting the import of shipments of turtle excluder
> device (TED) caught shrimp from uncertified countries.
> We foresee several difficulties with this approach.
>
> We believe that this approach will significantly di-
> minish the conservation benefit of P.L. 101-162, Sec-
> tion 609.  By requiring that TEDs be used only on
> those vessels that harvest shrimp for export to the
> U.S. market, sea turtles will be put at greater risk
> of incidental capture aboard non-TED equipped boats
> in a nation's fleet.
>
> This approach will also reduce the incentive for
> nations to adopt comprehensive national programs to
> reduce the incidental take of sea turtles.  The "ship-
> ment-by-shipment" authorization may also result in
> some certified nations abandoning the comprehensive
> programs they now have in place or curtailing enforce-
> ment of such programs.
>
> A "shipment-by-shipment" approach will also create
> enforcement problems.  It will be extremely difficult
> to verify that shrimp being imported as TED-caught
> from uncertified nations were actually harvested by
> a trawler using a TED.

AR Tab 4, first page.

                                (2)

Whatever the underlying differences of opinion, de-

fendants' stated position herein is that their 1998 Revised

Guidelines are in accordance with section 609(b)(1), supra.  In

summary, they argue that the guidelines conform to the plain

meaning of the statute, that its legislative history supports

their interpretation, and that any ambiguity should be resolved

in a manner deferential to their administrative prerogatives and/or that affects the fewest nations and shipments possible, consistent with the doctrine articulated in <u>Murray v. Schooner Charming Betsy</u>, 6 U.S. (2 Cranch) 64, 118 (1804).

No doubt, this position, and that of the intervenor-defendant, derive from their presentations on the merits to the Court of Appeals for the Federal Circuit[29], which did vacate this court's slip op. 96-165 on the issue raised again herein, albeit on procedural grounds "deemed to be without prejudice"[30] to re-newal.  There also can be no doubt, and none of the parties argue otherwise, that

> [i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

<u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc</u>., 467 U.S. 837, 842-43 (1984); <u>Earth Island Institute v. Chris-topher</u>, 19 CIT at 1479, 913 F.Supp. at 575.

The primary focus of the initial litigation over sec-tion 609 was whether it was intended to be enforced worldwide, that is, "within the geographic range of distribution of [en-dangered] sea turtles"[31], or just within the wider Caribbean/

---

[29] <u>See</u>, <u>e</u>.<u>g</u>., <u>supra</u> n. 12.

[30] 147 F.3d at 1356.

[31] Section 609(a)(5)(A), 103 Stat. at 1037, 16 U.S.C. §1537 note.

western Atlantic, which was the government's challenged initial preference and practice.  The court held the statute's scope to be

> clear and unambiguous.  . . . Its language includes "<u>all</u> foreign governments which are engaged in, or which have persons or companies engaged in, commercial fishing operations which . . . may affect adversely [endangered or threatened] species of sea turtles" and "protection of specific ocean and land <u>regions</u> which are of special significance to the health and stability of such species of sea turtles" and "amendment of <u>any</u> existing international treaty for the protection and conservation of such species of sea turtles to which the United States is a party" and "<u>each</u> nation" which conducts commercial shrimp fishing operations within the geographic range of distribution of such sea turtles and which may affect them adversely.  No language of section 609 restricts its geographical purview, nor can the court accept the premise that the statute is simply silent on the matter.

19 CIT at 1479, 913 F.Supp. at 575 (emphasis in original; footnotes omitted).  Apparently, the defendants now adhere to this decision.  <u>See</u>, <u>e.g.</u>, 1996 Revised Guidelines; 1998 Revised Guidelines; Part I B, <u>supra</u>; March 1999 Notice of Revisions.

That opinion of the court did uphold that part of the State Department's <u>Revised Guidelines for Determining Comparability of Foreign Programs for the Protection of Turtles in Shrimp Trawl Fishing Operations</u>, 58 Fed.Reg. 9,015, 9,017 (Feb. 18, 1993), which notified "affected nations" that, to receive certification pursuant to section 609(b)(2)(A) and (B), <u>supra</u>, in 1994 and in subsequent years, they had "to require the use of TEDs on all of their shrimp trawl vessels" and that the take rates of sea turtles would be "deemed comparable if the[y]

require that all shrimp trawl vessels use TEDs at all times".
See 19 CIT at 1483-84, 913 F.Supp. at 578.  That standard of
comparison was based upon the requirement for U.S. trawlers[32]
and is continued in the 1998 Revised Guidelines as a basis for
certification of foreign harvesting nations.  See 63 Fed.Reg. at
46,096.  Indeed, the history of section 609's enforcement to date
does not reveal presidential certification of such nations, in-
cluding those of the wider Caribbean/western Atlantic region, to
Congress under subsections (b)(2)(A) and (B) other than on that
ground.  Hence, Brazil, for example, has not been certified each
year, even though individual trawlers flying its flag are and
have been rigged with TEDs.[33]

It is the shrimp netted by such vessels around the world

---

[32] See generally Dep't of Commerce, Nat'l Oceanic and Atmo-
spheric Admin., Sea Turtle Conservation; Shrimp Trawling Re-
quirements, 52 Fed.Reg. 24,244 (June 29, 1987).

[33] Compare, e.g., Dep't of State, Bureau of Oceans and Int'l
Environmental and Scientific Affairs, Certifications Pursuant to
Section 609 of Public Law 101-162, 59 Fed.Reg. 25,697 (May 17,
1994)(Brazil certified because it "has established and is im-
plementing the legal requirement to use TEDs"), and Dep't of
State, Bureau of Oceans and Int'l Environmental and Scientific
Affairs, Certifications Pursuant to Section 609 of Public Law
101-162, 62 Fed.Reg. 19,157 (April 18, 1997)(Brazil recertified
because of regulation adopted "prohibiting shrimp trawling con-
ducted in ways harmful to sea turtles"), with Bureau of Oceans
and International Environmental and Scientific Affairs; Certi-
fications Pursuant to Section 609 of Public Law 101-162, 61 Fed.
Reg. 24,998 (May 17, 1996)(Brazil deleted from list of certified
nations), and Bureau of Oceans and International Environmental
and Scientific Affairs; Certifications Pursuant to Section 609 of
Pub.L. 101-162, 63 Fed.Reg. 30,550 (June 4, 1998)(Brazil did not
retain certification because it "failed to demonstrate . . . reg-
ulations requiring the use of . . . TEDs[] were being adequately
enforced").

that is now granted entry to the expansive U.S. market by the 1998 Revised Guidelines on the ground quoted above, namely, the harvesting of shrimp with TEDs does not adversely affect sea turtle species.  And the intervenor-defendant, if not all of the defendants, is of the view that this approach will encourage more vessels from uncertified countries to equip their nets with TEDs, thereby rescuing ever more endangered by-catch and also increasing the likelihood of presidential certification of additional home-port nations.

Whatever the appeal of this perception, the court cannot and therefore does not conclude that it comports with the expressed approach of Congress in section 609, which is notable for its clarity of purpose and cohesiveness of content. Certainly, Congress did not intend to, or in fact, leave room for the kind of reversal of course the defendants attempt to renew herein.[34]  Indeed, prior to this court's judgment in <u>Earth Island</u>

---

[34] Defendants' record contains a letter from a member of Congress who had voted for section 609 in 1989 and who, now as Ranking Democratic Member of the Committee on Resources, U.S. House of Representatives, corresponded with President Clinton on June 23, 1998, in part, as follows:

> . . . I have grave concerns about the Administration implementing a shipment-by-shipment approach.  Such an approach is not only unenforceable, it is inconsistent with the clear congressional intent of P.L. 101-162, which requires certification that harvesting nations have adopted a regulatory program governing the incidental taking of such sea turtles that is "comparable" to that of the United States. As a result of hard work by Congress, the environmental community, and the National Marine Fisheries Service, the U.S. has implemented a comprehensive regulatory program to ensure

(footnote continued)

Institute v. Christopher that the government was in violation of

the intent of Congress that section 609 apply to shrimp shipments

from everywhere in the world[35], not just the wider Carribean,

_____

> that turtle excluder devices (TEDs) are used throughout
> the U.S. shrimp fishery.  Thus, for purposes of cert-
> ifying harvesting nations under P.L. 101-162, the Ad-
> ministration cannot merely attempt to satisfy itself
> that individual shipments have been harvested using
> TEDs; it must ensure that those nations have adopted
> comprehensive TEDs protections.

AR Tab 2, first page.

> To the extent others in Congress may have a different
> opinion, none has been presented herein by the defendants.  Be
> that as it may, the court has already found that section 609's
> legislative history, such as it is, does not sway intepretation
> of the adopted language.  See Earth Island Institute v. Chris-
> topher, 19 CIT at 1421, 913 F.Supp. at 576.

[35] In fact, the government's disregard of this fundamental
dictate of section 609, as reflected in subsection (a) thereof,
supra, until ordered to cease and desist by the court in 1996,
proved to be a predicate of the decision of the WTO Appellate
Body, to wit:

> . . . The record does not . . . show that serious ef-
> forts were made by the United States to negotiate sim-
> ilar agreements [to the Inter-American Convention] with
> any other country or group of countries before (and,
> as far as the record shows, after) Section 609 was en-
> forced on a world-wide basis on 1 May 1996.  Finally,
> the record also does not show that the appellant, the
> United States, attempted to have recourse to such in-
> ternational mechanisms as exist to achieve cooperative
> efforts to protect and conserve sea turtles before im-
> posing the import ban.

> 172.  Clearly, the United States negotiated seriously
> with some, but not with other Members (including the
> appellees), that export shrimp to the United States.
> The effect is plainly discriminatory and, in our view,
> unjustifiable.  The unjustifiable nature of this dis-
> crimination emerges clearly when we consider the
> cumulative effects of the failure of the United States

                                          (footnote continued)

the act was administered exclusively on an inter<u>national</u> basis,
as recently explained at length to the WTO.  Consistent with the
mandate of section 609, paragraphs 61 and 64 quoted above show
the United States has taken into account the "shrimp fishing
environments" of harvesting nations that do and do not pose a
threat to sea turtles, not their individual citizens or companies
at work in those waters.  Hence, Brazil, for example, with
trawlers outfitted with TEDs, still has been found to be a
harvesting nation with commercial fishing technology which "may"
affect adversely the endangered species of sea turtles and thus
within such expansive, "general" ambit of the section 609(b)(1)
prohibition, <u>supra</u>, "except as provided in paragraph (2)."  Given
that clause in that context and the fact that general provisions

_____

> to pursue negotiations for establishing consensual
> means of protection and conservation of the living
> marine resources here involved, notwithstanding the
> explicit statutory direction in Section 609 itself to
> initiate negotiations as soon as possible for the
> development of bilateral and multilateral agreements.
> The principal consequence of this failure may be seen
> in the resulting unilateralism evident in the applica-
> tion of Section 609.  As we have emphasized earlier,
> the policies relating to the necessity for use of
> particular kinds of TEDs in various maritime areas, and
> the operating details of these policies, are all shaped
> by the Department of State, without the participation
> of the exporting Members.  The system and processes of
> certification are established and administered by the
> United States agencies alone.  The decision-making
> involved in the grant, denial or withdrawal of
> certification to the exporting Members, is, according-
> ly, also unilateral.  The unilateral character of the
> application of Section 609 heightens the disruptive and
> discriminatory influence of the import prohibition and
> underscores its un justifiability.

WTO Appellate Body Report, paras. 171, 172 (citations omitted).

rarely can be read to be dispositive of specific standards of a carefully-constructed statutory scheme, the court is constrained to conclude yet again that paragraph (1) of section 609(b) is specifically contingent upon the certification procedure established by section 609(b)(2), which offers the only congressionally-approved breaches of the embargo, either via subparagraphs (A) and (B) or through (C).  Paragraphs (b)(1) and (b)(2) are pari materia; they cannot be read independently, or out of the context adopted by Congress, including section 609(a), to slow or stanch the extinction of species of sea turtles.  And so long as the 1998 Revised Guidelines report that the "foundation of the U.S. program" continues, with "limited exceptions", to be that "all other commercial shrimp trawl vessels operating in waters subject to U.S. jurisdiction in which there is a likelihood of intercepting sea turtles must use TEDs at all times"[36], the catch of vessels equipped with TEDs from nations without such comparable foundation continues subject to embargo.

III

        In the light of the foregoing, the court concludes that that part of the 1998 Revised Guidelines which constitutes the decision to permit the importation of TED-caught shrimp from uncertified nations, on its face, is not in accordance with section 609, supra.  Before any entry of judgment on plaintiffs' motion herein, however, the court will await defendants' annual report

---

        [36] 63 Fed.Reg. at 46,095.  See generally Part I B, supra.

to Congress pursuant to section 609(b)(2), their report to the court on any responses to their March 1999 Notice of Revisions, and the presentment of evidence on or before July 2, 1999 regarding the actual enforcement of the 1998 Revised Guidelines to date, as well as of the 1996 Revised Guidelines between April and November of 1996.

So ordered.

Dated:  New York, New York
        April 2, 1999

_____
                                   Judge